**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

DAVID HUTFILZ; JUSTIN D. ASHMORE REVOCABLE TRUST; RYAN HAGER FARMS, LLC; STEVEN LUECK; MICHAEL SCHWAGER; DREW FLEMMING; MATT BONERT; ROBERT HARRIS; EDLING FARMS, INC.; GREG GLASS, PIPCO FRUIT, LLC; KISLING AG SERVICES LLC; MICHAEL WOOD FARMS, INC.; HIGHWAY 33 FARMS, INC.; ZACKARY MCMILLON; DUANE HOFER, JR.; TIM VANCO; AARON HASSER; RANDY SULLINS; PAUL HATLEY; COLDWATER PLANTING COMPANY; and BALLY KEAL VINEYARDS, LLC, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

NUTRIEN LTD.; NUTRIEN AG SOLUTIONS, INC.; THE MOSAIC COMPANY; MOSAIC FERTILIZER, LLC; MOSAIC GLOBAL SALES, LLC, MOSAIC CANADA CROP NUTRITION, LP; CANPOTEX LIMITED; CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES NITROGEN, LLC; CF INDUSTRIES, INC.; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH FERTILIZER WEVER, LLC; KOCH FERTILIZER BEATRICE, LLC; KOCH FERTILIZER DODGE CITY, LLC; KOCH FERTILIZER CANADA, ULC; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; YARA FREEPORT LLC, and DOES 1–20,

Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................................2

II. PARTIES ....................................................................................................6

A. Plaintiffs ....................................................................................................6

B. Defendants ....................................................................................................12

C. Agents and Co-Conspirators ....................................................................................................20

III. JURISDICTION AND VENUE ....................................................................................................21

IV. FACTUAL ALLEGATIONS ....................................................................................................22

A. Overview of the U.S. Fertilizer Market: Three Primary Types, Their Applications, and Agronomic Role ....................................................................................................22

B. U.S. Market Size and Structural Trends over Time ....................................................................................................26

C. Vertical Integration and Distribution Channel Control ....................................................................................................31

D. Defendants' Conspiracy Drove Fertilizer Prices to Supracompetitive Levels that Cannot Be Explained by Supply and Demand or Other Legitimate Market Forces ....................................................................................................36

E. Defendants Coordinated Supply Curtailments and Capacity Reductions....................................................................................................70

F. Government Investigations ....................................................................................................76

G. Plus Factors Supporting the Inference of Unlawful Conspiracy ....................................................................................................82

V. ANTITRUST INJURY AND STANDING ....................................................................................................106

VI. TOLLING OF THE STATUTE OF LIMITATIONS....................................................................................................106

VII. CLASS ACTION ALLEGATIONS ....................................................................................................108

CLAIMS FOR RELIEF ....................................................................................................111

I. VIOLATION OF THE SHERMAN ACT ....................................................................................................111

II. VIOLATIONS OF STATE ANTITRUST LAWS ....................................................................................................112

III. VIOLATION OF STATE CONSUMER PROTECTION STATUTES....................................................................................................127

PRAYER FOR RELIEF ....................................................................................................142

DEMAND FOR JURY TRIAL ....................................................................................................143

DESIGNATION OF PLACE OF TRIAL....................................................................................................143

Plaintiffs, on behalf of themselves and all other persons and entities similarly situated (the "Classes" as defined below), bring this Class Action Complaint against Defendants alleging the following upon personal knowledge as to their own actions and upon information and belief as to all other matters upon the investigation of their counsel.

## I. INTRODUCTION

1. American farmers feed this country. They plant in the spring not knowing what they will get in the fall; they weather drought and flood and market swings; and they do it year after year because feeding a nation is not just a business—it is a calling. For generations, the promise of American agriculture was that a farmer who worked hard, managed well, and produced efficiently would have a fair shot at making a living. That promise has been broken by a small group of corporations that looked at everything farmers need to grow a crop and decided that need was an opportunity to exploit.

2. American farmers' planting decisions should turn on soil science and agronomic need. For more than five years, something else has governed them: a price-fixing conspiracy among the fertilizer producers who control the U.S. market coordinated to ensure that the price of fertilizer is artificially elevated and the supply is constrained. Plaintiffs bring this action on behalf of American growers and other agricultural purchasers who paid billions of dollars in supracompetitive fertilizer prices between 2021 and 2026 because five of the world's largest agricultural companies, Defendants Nutrien, Mosaic, CF Industries, Koch, and Yara, cheated instead of competed.[1]

---

[1] Unless otherwise specified, references to "Nutrien" or "Nutrien Defendants" encompass both Nutrien Ltd. and Nutrien Ag Solutions, Inc.; references to "Mosaic" or "Mosaic Defendants" encompass The Mosaic Company, Mosaic Fertilizer, LLC, Mosaic Global Sales, LLC, and Mosaic Canada Crop Nutrition, LP; references to "CF Industries" or "CF Industries Defendants" encompass CF Industries Holdings, Inc., CF Industries Nitrogen, LLC, and CF Industries, Inc.; references to "Koch" or "Koch Defendants" encompass Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, Koch Fertilizer Wever, LLC, Koch Fertilizer Beatrice, LLC, Koch Fertilizer

3. Fertilizer is not a discretionary input. It is the foundation of American agricultural productivity, and no commercially viable substitute exists. United States farmers plant approximately 90 million acres of corn, 85 million acres of soybeans, and 40 million acres of wheat each year, and every one of those acres and millions of other acres for a variety of crops require nitrogen, phosphorus, and potassium (collectively, "NPK") fertilizers at agronomically determined rates. Without adequate fertilization, yields collapse by 20% to 40% or more. A farmer facing a price spike can neither shop elsewhere nor skip an application: the market is too concentrated, and the yield penalty is too severe. Defendants know this. Their executives tracked corn and soybean prices as the primary variable in their pricing decisions, calibrating fertilizer prices to what farmers could afford rather than to what production cost. That is not competition. That is exploitation.

4. The consequences are visible in the data and audible in the testimony of the farmers who are living through it. Farmer bankruptcies in the United States rose 46% in 2025. Fertilizer costs now consume 40% of American farmers' total input costs. As Trent Kubik, President of the South Dakota Growers Association, testified before the U.S. Senate Agriculture Committee in May 2026, fertilizer companies "can disregard their own cost of production and simply set a price," because farmers have nowhere else to go and cannot afford not to buy. Senator Welch put it plainly at the same hearing: "American agriculture is in a crisis because an immense amount of wealth is being created by farmers who are not receiving it." And Mark Mueller, President of the Iowa Corn Growers Association, testified that farmers are being forced to choose between buying fertilizer and staying solvent.

---

Dodge City, LLC, and Koch Fertilizer Canada, ULC; and references to "Yara" or "Yara Defendants" encompass Yara International ASA, Yara Freeport LLC, and Yara North America, Inc.

5. Defendants collectively control the American fertilizer supply chain from mine to farm gate. Beginning in or around 2021 and continuing through the present, Defendants conspired to fix, raise, and maintain fertilizer prices at supracompetitive levels and to restrict supply to sustain those prices. Fertilizer prices tripled, quadrupled, and for some products quintupled from their 2020 baseline, generating record profits for every Defendant while imposing catastrophic input cost increases on American farmers.

6. The financial record is damning. Between 2020 and 2022, Nutrien's profits increased approximately 1,575%. Mosaic's net earnings rose approximately 438%. CF Industries' profits increased more than 900%. These were not recoveries from pandemic-related losses: Nutrien, Mosaic, and CF Industries each earned hundreds of millions of dollars in 2020, which makes the ensuing explosion in margins impossible to attribute to a rebound.

7. The cost-to-profit ratio tells the full story. From 2020 to 2021, Nutrien's costs rose 17% while its operating income surged 593%—a ratio of 35:1—meaning Nutrien captured $35 of additional profit for every $1 of additional cost. Mosaic's costs rose 20% while its operating income surged 498%, a ratio of 24:1. No competitive explanation accounts for profits growing 10 to 15 times faster than costs. These are cartel profits. As CF Industries' CEO Anthony Will acknowledged on August 5, 2024, when natural gas prices were at historic lows, the company expected "the global energy cost structure to continue to provide significant margin opportunities for our North American production network"—not because costs justified the prices, but because coordinated pricing and supply discipline among the Defendants ensured they would persist.

8. Defendants' coordination on price is documented in Defendants' own SEC filings, confirmed by standard econometric analysis, and captured in real time by Bloomberg's Green Markets—the authoritative weekly trade publication for the fertilizer industry. For example, on

July 24, 2023, Koch posted new nitrogen ammonia fertilizer fill prices at $465–$470 per short ton ("/st") at terminals in the Eastern Cornbelt region of the United States and CF Industries followed the next day by posting $480–$485/st. Nutrien then immediately reposted $485/st, matching CF Industries' ceiling. Each step in the sequence raised or held the price. No Defendant undercut. The market ratcheted upward through the sequence, which is the opposite of what competition produces. This sequential pattern—one Defendant posting with the next Defendant following at a similar or higher price within hours or days—repeated itself across at least nine discrete fill cycles during the Class Period spanning each fertilizer nutrient and every major growing region in the United States. No competitive explanation accounts for that degree of pricing synchronization among independent producers of a fungible commodity. It is the market signature of coordinated pricing, not independent competition.

9. But Defendants did not merely price in parallel, they also suppressed supply in parallel. On a Q1 2021 earnings call, Nutrien declared that its strategy was explicitly "price over supply." From that point on, the Defendants moved in lockstep—curtailing production, idling plants, withholding capacity in concert, and practicing "disciplined capital allocation," each move reinforcing the others. On December 9, 2022, a Scotiabank analyst captured the coordinated logic precisely when he remarked that, with Mosaic having taken the lead on curtailment, Nutrien "effectively holds a 'free' call option on tightening the potash market into the spring." On a Q1 2023 earnings call, Mosaic's CEO stated that he would not restore idled production because doing so would "destroy the market." That is not the language of a firm competing for market share. It is the language of a firm confident that supply discipline will hold.

10. The federal government has reached the same conclusion. The U.S. Department of Justice ("DOJ") Antitrust Division's Chicago Office opened a formal investigation targeting each

Defendant for possible civil and criminal antitrust violations. The Federal Trade Commission ("FTC") opened its own "major industrywide investigation into the precipitous rise of fertilizer prices in this country." In January 2026, U.S. Department of Agriculture ("USDA") Deputy Secretary Stephen Vaden publicly stated that Nutrien and Mosaic "collude" to constrain supply and drive-up prices, describing their combined market position as a "duopoly" that has been playing a "cute little game" with fertilizer costs "for the last several years." And on August 3, 2026, Deputy Secretary Vaden confirmed that the DOJ and FTC investigations are concluding and that he expects formal enforcement action "in due time."

11. Plaintiffs bring this action under Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, on behalf of two classes of American farmers and agricultural purchasers who bought Fertilizer Products[2] at artificially inflated prices due to Defendants' illegal conspiracy from January 1, 2021, through the present (the "Class Period"). Plaintiffs seek to hold Defendants accountable for the billions of dollars they unlawfully extracted from American agriculture and to restore the competitive market conditions to which federal law entitles American farmers.

## II. PARTIES

### A. Plaintiffs

12. Plaintiff David Hutfilz operates a farm at 18735 Frost Road, Hemlock, Michigan, and produces corn, soybeans, and dry beans. Since January 2021, Mr. Hutfilz has purchased

---

[2] "Fertilizer Products" means any single-nutrient fertilizer or multi-nutrient fertilizer blend containing nitrogen, phosphorus, potassium, or any combination thereof, including, but not limited to: (a) nitrogen fertilizers such as anhydrous ammonia, urea, urea ammonium nitrate (UAN) solutions, ammonium nitrate, and ammonium sulfate; (b) phosphate fertilizers such as diammonium phosphate (DAP), monoammonium phosphate (MAP), triple superphosphate (TSP), and phosphoric acid-based products; (c) potash fertilizers such as muriate of potash (MOP, also known as potassium chloride), sulfate of potash (SOP), and potassium magnesium sulfate; and (d) multi-nutrient blends, compound fertilizers, and custom-blended NPK products containing any combination of the foregoing nutrients in any ratio.

Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail locations at 4648 S. Garfield Rd., Auburn, Michigan; 1753 N. Sixth Street, Carrollton, Michigan; and 8263 N. Ransom Road, Breckenridge, Michigan.

13. Plaintiff Justin D. Ashmore Revocable Trust (the "Ashmore Trust") operates a farm at 1091 West Big Bear Lane, Logan, Kansas, and produces corn, soybeans, wheat, and cattle feed. Since January 2021, the Ashmore Trust has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 1753 N. Terrace, Stockton, Kansas.

14. Plaintiff Ryan Hager Farms, LLC, operates a farm at 3340 Big Spring Road, Vine Grove, Kentucky, and produces corn and soybeans. Since January 2021, Ryan Hager Farms, LLC, has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 7410 US Highway 60, Ekron, Kentucky.

15. Plaintiff Steven Lueck operates a farm at 3011 177 Street, Dyersville, Iowa, and produces corn and soybeans. Since January 2021, Mr. Lueck has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail locations at 2327 Commerce Court SW, Dyersville, Iowa, and 1213 12th Avenue SE, Suite 106, Dyersville, Iowa.

16. Plaintiff Michael Schwager operates a farm at 26917 216th Street, Bellevue, Iowa, and produces corn and soybeans. Since January 2021, Mr. Schwager has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 406 East White Street, Preston, Iowa.

17. Plaintiff Drew Flemming operates a farm at 202 S. Scott St., Saint Francis, Kansas, and produces corn, wheat, and sorghum. Since January 2021, Mr. Flemming has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 1302 Rd. 27, Bird City, Kansas.

18. Plaintiff Matt Bonert operates a farm at 24587 E Pleasant Grove Rd., Epworth, Iowa, and produces corn and hay. Since January 2021, Mr. Bonert has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 2327 Commerce Ct., Dyersville, Iowa.

19. Plaintiff Robert Harris operates a farm at 3990 Greenfield Bend Road, Williamsport, Tennessee, and produces corn and soybeans. Since January 2021, Mr. Harris has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms

of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 811 Highway 43 North, Ethridge, Tennessee.

20. Plaintiff Edling Farms, Inc., operates a farm at 10455 115th Ave SE, Clear Lake, Minnesota, and produces potatoes. Since January 2021, Edling Farms, Inc., has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 20190 Highway West, Big Lake, Minnesota.

21. Plaintiff Greg Glass operates a farm at 1979 S. 900 E, Marion, Indiana, and produces corn, soybeans, wheat, and alfalfa hay. Since January 2021, Mr. Glass has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers from its retail location at 423 E. 1000 S., Warren, Indiana.

22. Plaintiff Pipco Fruit, LLC, located at 401 W Fallbrook Ave., Suite 204, Fresno, California, operates several farms throughout Fresno and Madera Counties and produces peaches, nectarines, and plums. Since January 2021, Pipco Fruit, LLC has purchased Fertilizer Products from Defendant Nutrien Ag Solutions, Inc., specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from its retail locations at 7815 North Palm Ave., Fresno, California; 3150 S Willow Ave., Fresno, California, and 3173 S Chestnut Ave., Fresno, California.

23. Plaintiff Kisling Ag Services LLC operates a farm at 15539 Peach Ave, Stockport, Iowa, and produces corn and soybeans. Since January 2021, Kisling Ag Services LLC has

purchased Fertilizer Products, specifically potash and phosphate, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

24. Plaintiffs Michael Wood Farms, Inc., and Highway 33 Farms, Inc., operate a farm at 1352 Hwy 33, Newport, Arkansas, and produce rice. Since January 2021, they have purchased Fertilizer Products, specifically various forms of nitrogen, phosphate, potash, and NPK blended fertilizers, including MicroEssentials SZ, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer. MicroEssentials SZ is a premium dry phosphate fertilizer developed by Defendant The Mosaic Company.

25. Plaintiff Zackary McMillon operates a farm at 1633 Greene 710 Rd., Paragould, Arkansas, and produces rice, corn, and soybeans. Since January 2021, Mr. McMillon has purchased Fertilizer Products, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

26. Plaintiff Duane Hofer, Jr., operates a farm at 28282 Meadowview Road, Junction City, Oregon, and produces grass seed and grains. Since January 2021, Mr. Hofer has purchased Fertilizer Products, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

27. Plaintiff Tim Vanco operates a farm at 12210 Silverthorn Rd., Edinboro, Pennsylvania, and produces over 50 varieties of produce, including corn, soybeans, hay, oats, sweet corn, tomatoes, cabbage, broccoli, eggplant, and cucumbers. Since January 2021, Mr. Vanco has purchased Fertilizer Products, specifically various forms of nitrogen, potash, phosphate,

and NPK blended fertilizers, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

28. Plaintiff Aaron Hasser operates a farm at Hasser Farms, 900 N. & 400 W., Earl Park, Indiana, and produces corn and soybeans. Since January 2021, Mr. Hasser has purchased Fertilizer Products, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

29. Plaintiff Randy Sullins operates a farm at 85 Otinger Dr., Horton, Alabama, and produces watermelons, pumpkins, and gourds. Since January 2021, Mr. Sullins has purchased Fertilizer Products, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

30. Plaintiff Paul Hatley operates a farm at 888 John Rogers Road, Hurdle Mills, North Carolina, and produces tobacco, wheat, and hay. Since January 2021, Mr. Hatley has purchased Fertilizer Products, specifically various forms of nitrogen, potash, phosphate, and NPK blended fertilizers, at prices that were artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

31. Plaintiff Coldwater Planting Company is a Mississippi partnership consisting of two-member Limited Liability Companies: Kate's Hope LLC and War Eagle Farms LLC. These are both Mississippi companies consisting of the same two member individuals: William Brennan Chapman and Mary Grace Chapman (husband and wife). Coldwater Planting Company farms in Coahoma County and Quitman County, Mississippi. Since January 2021, Coldwater Planting

Company has purchased Fertilizer Products at prices that were artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

32. Plaintiff Bally Keal Vineyards, LLC, located at 1300 El Camino Real #100, Colma, California, operates a vineyard in Solano County and produces grapes. Since January 2021, Bally Keal Vineyards, LLC has purchased Fertilizer Products, specifically nitrogen fertilizer, at prices artificially inflated by Defendants' price-fixing conspiracy during the Class Period from a non-defendant retailer.

33. Plaintiffs intend to purchase Fertilizer Products in the future.

**B. Defendants**

**The Nutrien Defendants**

34. Defendant Nutrien Ltd. is a corporation organized and existing under the laws of Canada, with its principal place of business in Saskatoon, Saskatchewan. Formed through the January 2018 merger of PotashCorp and Agrium Inc., Nutrien Ltd. is the world's largest producer of potash and one of the world's largest producers of nitrogen and phosphate fertilizers. It produces and distributes approximately 27.5 million tonnes of fertilizer products globally each year and operates more than 1,900 retail locations across North America, South America, and Australia. Nutrien Ltd. holds a 50% interest in Canpotex Limited, and Mosaic Canada Crop Nutrition, LP holds the other 50%.

35. Defendant Nutrien Ag Solutions, Inc. is a wholly owned subsidiary of Nutrien Ltd., organized and existing under the laws of Delaware, with its principal place of business in Loveland, Colorado. As the primary retail arm of Nutrien Ltd., it is the largest agricultural retailer in the United States, capturing approximately 21% of all U.S. agricultural retail sales, and it generates a significant majority of its fertilizer sales from Nutrien Ltd.'s own production.

36. The Nutrien Defendants operate as a single enterprise under the direction and control of Nutrien Ltd., which sets pricing strategy for its fertilizer operations in the United States, and its subsidiaries and joint ventures execute that strategy. Nutrien Ltd. owns 100% of Nutrien Ag Solutions, Inc., the retail arm through which Nutrien's production reaches American farmers. As alleged above, Nutrien Ag Solutions, Inc., sources a significant majority of its fertilizer from Nutrien Ltd.'s own production facilities, generating real-time downstream visibility into demand and pricing that flows back up to Nutrien Ltd.'s centralized pricing function. *See infra* ¶¶95–96. That mine-to-farm-gate integration—six Saskatchewan potash mines, global nitrogen and phosphate production, and more than 1,900 North American retail locations under unified ownership—confirms that Nutrien Ltd. and Nutrien Ag Solutions, Inc., operate as a single economic unit with no independent pricing discretion at the subsidiary level.

37. The conspiracy alleged in this Complaint is not among or between the Nutrien Defendants; rather, Nutrien, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Nutrien Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce, or set prices and strategy for the same, during the Class Period.

**The Mosaic Defendants**

38. Defendant The Mosaic Company is a corporation organized and existing under the laws of Delaware, with its principal place of business in Tampa, Florida. Formed in 2004 through the merger of IMC Global Inc. and the fertilizer businesses of Cargill, Incorporated, The Mosaic Company mines potash and phosphate in the United States and is a world-leading producer and marketer of concentrated phosphate and potash crop nutrients, which it sells and distributes in the United States.

39. Defendants Mosaic Fertilizer, LLC, and Mosaic Global Sales, LLC, are wholly owned subsidiaries of The Mosaic Company, each organized and existing under the laws of Delaware, with their principal places of business in Tampa, Florida. Mosaic Fertilizer, LLC, operates major fertilizer production facilities in Florida and Louisiana. Mosaic Global Sales, LLC, sells Fertilizer Products directly to consumers in the United States and operates on a wholesale and agricultural scale for farmers and industrial buyers.

40. Defendant Mosaic Canada Crop Nutrition, LP, is a wholly owned subsidiary of The Mosaic Company, organized and existing under the laws of Canada, with its principal place of business in Saskatoon, Saskatchewan. Mosaic Canada Crop Nutrition, LP, mines potash in Canada to produce fertilizer that is exported to the United States. It holds 50% interest in Canpotex Limited, and Nutrien Ltd. holds the other 50%.

41. The Mosaic Defendants operate as a single enterprise under the direction and control of The Mosaic Company, which sets pricing strategy for its fertilizer operations in the United States, and its subsidiaries and joint ventures execute that strategy. Mosaic Fertilizer, LLC and Mosaic Global Sales, LLC are wholly owned Delaware subsidiaries that, respectively, produce and sell the fertilizer The Mosaic Company prices and markets. Mosaic Canada Crop Nutrition, LP is a wholly owned Canadian subsidiary that mines Canadian potash for export to the United States. The Mosaic Company controls production, logistics, and pricing across all three subsidiaries through an integrated operational infrastructure that runs from mine through finished granule and port terminal, as alleged below. *See infra* ¶¶97–98. Mosaic Fertilizer, LLC's Tampa and Port Sutton ammonia terminals, Mosaic Global Sales, LLC's wholesale transactions to distributors and agricultural retail networks, and Mosaic Canada Crop Nutrition, LP's Canadian

potash production all operate pursuant to pricing and supply strategies set by The Mosaic Company, with no independent pricing discretion at the subsidiary level.

42. The conspiracy alleged in this Complaint is not among or between the Mosaic Defendants; rather, Mosaic, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Mosaic Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce, or set prices and strategy for the same, during the Class Period.

**Defendant Canpotex**

43. Defendant Canpotex Limited ("Canpotex") is a Canadian joint venture wholly owned and controlled by Nutrien Ltd. and Mosaic Canada Crop Nutrition, LP, and is headquartered in Saskatoon, Canada. Canpotex is one of the world's largest suppliers of potash. Nutrien and Mosaic formed Canpotex in 1970 and began in 1972 as a Saskatchewan export association to coordinate the marketing, sales, and distribution of Canadian potash products. It manages a centralized transportation network of customized railcars, port terminal facilities, and ocean vessels. By selling potash through a single export marketing organization, Canpotex gives its owners a mechanism for coordinating key aspects of potash sales, including export volumes and shipment schedules. Nutrien and Mosaic use Canpotex to collect and share competitively sensitive information concerning potash production, inventories, customer demand, pricing conditions, and shipment logistics. While Canpotex does not export potash into the United States, its primary function as a joint exporting and marketing organization allows Nutrien and Mosaic to align their pricing and supply strategies in this country. Canpotex's conduct therefore has had a direct, substantial, and reasonably foreseeable effect on domestic commerce and has restrained trade within the United States. *See infra* ¶¶234–44.

**The CF Industries Defendants**

44. Defendant CF Industries Holdings, Inc., is a corporation organized and existing under the laws of Delaware, with its principal place of business in Northbrook, Illinois. As one of the world's largest producers of nitrogen, with an extensive production and manufacturing network located primarily in North America, it is the ultimate parent of CF Industries Nitrogen, LLC, CF Industries, Inc., and other foreign subsidiaries responsible for producing and distributing fertilizer products outside the United States. It also holds 50% ownership interest in Point Lisas Nitrogen Limited, a company based in Trinidad and Tobago that annually produces hundreds of thousands of tons of anhydrous ammonia, an essential upstream input for the nitrogen fertilizers sold into the United States. Koch Industries, Inc., holds the other 50% ownership interest.

45. Defendant CF Industries Nitrogen, LLC, is a subsidiary of CF Industries Holdings, Inc., incorporated in Delaware, with its principal place of business in Northbrook, Illinois. CF Industries Holdings, Inc., owns 89% of it, and CHS Inc. owns the remaining 11%. A leading producer of nitrogen fertilizers in the United States, it operates major nitrogen complexes in Donaldsonville, Louisiana; Sergeant Bluff, Iowa; Claremore, Oklahoma; Yazoo City, Mississippi; Woodward, Oklahoma; Waggaman, Louisiana; and other domestic locations.

46. Defendant CF Industries, Inc., is a wholly owned subsidiary of CF Industries Holdings, Inc., incorporated in Delaware, with its principal place of business in Northbrook, Illinois, and is its parent's primary operating subsidiary for the sale and distribution of fertilizer in the United States.

47. The CF Industries Defendants operate as a single enterprise under the direction and control of CF Industries Holdings, Inc., which sets pricing strategy for its fertilizer operations in the United States, and its subsidiaries and joint ventures execute that strategy. CF Industries

Holdings, Inc., owns 89% of CF Industries Nitrogen, LLC—the primary domestic nitrogen producer—and 100% of CF Industries, Inc., its primary U.S. sales and distribution subsidiary. As alleged below, CF Industries Nitrogen, LLC, operates major nitrogen complexes across seven domestic locations with access to a 2,000-mile ammonia pipeline system, and CF Industries, Inc., distributes the product those facilities produce through terminal and storage assets across the Corn Belt and Gulf Coast. *See infra* ¶99. No singular CF Industries subsidiary independently determines what price its nitrogen products will carry; pricing is set centrally by CF Industries Holdings, Inc., and implemented through the integrated production, pipeline, and distribution network its subsidiaries operate.

48. The conspiracy alleged in this Complaint is not among or between the CF Industries Defendants; rather, CF Industries, acting as a single enterprise, conspired with the other Defendant families identified herein. Each CF Industries Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce, or set prices and strategy for the same, during the Class Period.

**The Koch Defendants**

49. Defendant Koch Ag & Energy Solutions, LLC, is a limited liability company organized under the laws of Delaware, with its principal place of business in Wichita, Kansas. A wholly owned subsidiary of Koch Inc., it is the parent of every Koch business that produces, sells, or distributes nitrogen fertilizer products.

50. Defendant Koch Fertilizer, LLC, is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, and a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Wichita, Kansas. It operates Koch's worldwide nitrogen fertilizer production, distribution, and trading businesses and sells fertilizer products to

agricultural purchasers in the United States, and it holds 50% ownership interest in Point Lisas Nitrogen Limited, with CF Industries Holdings, Inc., holding the other 50%.

51. Defendants Koch Fertilizer Wever, LLC, Koch Fertilizer Beatrice, LLC, and Koch Fertilizer Dodge City, LLC, are wholly owned subsidiaries of Koch Ag & Energy Solutions, LLC, and limited liability companies organized and existing under the laws of Delaware, with their principal places of business in Wichita, Kansas. They produce nitrogen fertilizer at the Koch Fertilizer facilities in Wever, Iowa; Beatrice, Nebraska; and Dodge City, Kansas, respectively.

52. Defendant Koch Fertilizer Canada, ULC, is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, and a company organized and existing under the laws of Nova Scotia, Canada, with its principal place of business in Brandon, Manitoba. Koch Fertilizer Canada, ULC, produces nitrogen fertilizer at the Koch Fertilizer facility in Brandon, Manitoba, which serves farmers in Western Canada and the Northern Plains of the United States.

53. The Koch Defendants operate as a single enterprise under the direction and control of Koch Ag & Energy Solutions, LLC, which sets pricing strategy for its fertilizer operations in the United States, and its subsidiaries and joint ventures execute that strategy. Koch Ag & Energy Solutions, LLC, is the ultimate parent of Koch Fertilizer, LLC—the global nitrogen production, distribution, and trading subsidiary—and exercises unified control over Koch Fertilizer Wever, LLC, Koch Fertilizer Beatrice, LLC, Koch Fertilizer Dodge City, LLC, and Koch Fertilizer Canada, ULC, each of which produces nitrogen fertilizer at a specific domestic or Canadian facility. As alleged below, Koch Ag & Energy Solutions, LLC, coordinates production, common carrier pipeline logistics, and terminal infrastructure across its subsidiary network—including substantial shipping capacity on a primary Gulf Coast-to-Corn-Belt ammonia pipeline and access to more than 50 global terminals—under unified management. *See infra* ¶¶100–01. Each facility-

level subsidiary operates pursuant to pricing and supply strategies set by Koch Ag & Energy Solutions, LLC, with no independent pricing discretion.

54. The conspiracy alleged in this Complaint is not among or between the Koch Defendants; rather, Koch, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Koch Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce, or set prices and strategy for the same, during the Class Period.

**The Yara Defendants**

55. Defendant Yara International ASA ("Yara International") is a corporation organized and existing under the laws of Norway, with its principal place of business in Oslo, Norway. Yara International is the world's largest producer of nitrogen fertilizers and one of the largest fertilizer companies globally. Founded in 1905 as Norsk Hydro's agricultural division and operating as an independent entity since 2004, Yara International produces, distributes, and markets nitrogen-based crop nutrition products, including urea, UAN, ammonia, and calcium ammonium nitrate, in more than 60 countries, including the United States. Yara International transacts substantial commerce directly in the United States in Fertilizer Products and is subject to U.S. antitrust law for its conduct affecting U.S. commerce.

56. Yara International produces ammonia in the United States through Defendant Yara Freeport LLC, a joint venture in which Yara holds 68% interest and BASF holds the remaining 32%; the facility is located in Freeport, Texas, and has a capacity of 750,000 metric tons of ammonia per year. Yara Freeport LLC does not operate with independent pricing or supply discretion; rather, its manufacturing operations, product off-take allocations, and domestic supply strategies are centrally directed and controlled by Yara International as part of its integrated global

enterprise. Yara International distributes and sells nitrogen and phosphate fertilizers in the United States through its subsidiary, Yara North America, Inc. ("Yara North America"). Yara North America is a Delaware corporation with its principal place of business in Tampa, Florida, and a subsidiary of Yara International ASA. Its activities range from phosphate mining and ammonia and urea production to commodity trading and highly specialized agricultural and industrial products.

57. The Yara Defendants operate as a single enterprise under the direction and control of Yara International ASA, which sets pricing strategy for its fertilizer operations in the United States, and its subsidiaries and joint ventures execute that strategy. As alleged below, Yara International ASA can direct product from its global production network—operating in more than 60 countries—into or away from the U.S. market depending on pricing conditions, giving it structural control over domestic supply levels that neither Yara Freeport LLC nor Yara North America, Inc., could exercise independently. *See infra* ¶102. Yara Freeport LLC's production and Yara North America's terminal network and direct-to-retailer distribution relationships operate pursuant to pricing and supply strategies set by Yara International ASA.

58. The conspiracy alleged in this Complaint is not among or between the Yara Defendants; rather, Yara, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Yara Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce, or set prices and strategy for the same, during the Class Period.

**C. Agents and Co-Conspirators**

59. Defendants' respective officers, agents, employees, or representatives authorized, ordered, or performed the anticompetitive and unlawful acts alleged in this Complaint while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

60. Each corporate Defendant's agents operated under the authority and apparent authority of their respective principals, and each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified economic entity.

61. Persons and firms not named as defendants may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance of the conspiracy. Plaintiffs will amend this Complaint to identify those co-conspirators once they are ascertained.

62. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

63. When Plaintiffs refer to a corporate family or to companies by a single name in alleging participation in the conspiracy, Plaintiffs allege that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts or meetings on behalf of every Defendant company within the family.

## III. JURISDICTION AND VENUE

64. This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. §§15 and 26. The claims asserted herein arise under Section 1 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. §1.

65. Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391(b) and (c) because one or more Defendants resided in, transacted business in, are licensed to do business in, or are doing business in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred here. Defendants Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, Koch Fertilizer Wever, LLC, Koch Fertilizer Beatrice, LLC, and Koch Fertilizer Dodge City, LLC, for example, maintain their principal place of business in Wichita, Kansas.

66. This Court has personal jurisdiction over Defendants because they purposefully availed themselves of the privilege of conducting business in the United States and engaged in the conspiracy alleged herein, which was directed at, and caused harm throughout, the United States, including in this District.

## IV. FACTUAL ALLEGATIONS

### A. Overview of the U.S. Fertilizer Market: Three Primary Types, Their Applications, and Agronomic Role

67. Modern commercial agriculture depends on three primary plant macronutrients: nitrogen (N), phosphorus (P), and potassium (K). Because harvesting crops permanently removes these nutrients from the soil, farmers must replenish them through fertilizer applications. Without added fertilizer, soil loses fertility, yields decline, and crop quality deteriorates.

#### 1. Nitrogen Fertilizers

68. Nitrogen is the most widely consumed fertilizer nutrient by volume, accounting for approximately 59% of total U.S. fertilizer consumption, roughly twice the combined consumption of phosphate and potash. It drives vegetative growth, protein synthesis, and chlorophyll production, making it the primary determinant of crop yield. Because soil microbes continuously consume and volatilize nitrogen, farmers must replenish it every growing season, which creates consistent and inelastic annual demand.

69. The principal nitrogen fertilizer products include: (a) Anhydrous Ammonia (NH3), the most concentrated nitrogen fertilizer at 82% nitrogen by weight, applied as a pressurized gas directly into the soil and used primarily for corn and wheat production in the Midwest; (b) Urea (CO(NH2)2), containing approximately 46% nitrogen and the most widely traded solid nitrogen fertilizer globally, used across virtually all major crop types, including corn, wheat, rice, sugarcane, cotton, and vegetables; (c) Urea Ammonium Nitrate (UAN), a liquid fertilizer solution

containing 28% to 32% nitrogen used in fertigation and surface application for corn and wheat; (d) Ammonium Nitrate (AN), a dry granular product with approximately 34% nitrogen used in grain production; and (e) Ammonium Sulfate (AS), a by-product of industrial processes containing 21% nitrogen and 24% sulfur, used on crops with high sulfur demand such as corn, soybeans, and canola.

70. Each Defendant manufactures and commercializes nitrogenous fertilizers, offering overlapping product lines to farmers throughout the United States.

**2. Phosphate Fertilizers**

71. Phosphate fertilizers account for approximately 19% of total U.S. fertilizer consumption by volume and are essential for root development, energy transfer, seed formation, and crop maturation. Unlike nitrogen, phosphate does not volatilize from soil; it binds tightly to soil particles and must be continuously replenished because each harvest removes significant quantities. Phosphate fertilizers are derived from mined phosphate rock, a non-renewable resource of which the United States holds important reserves, primarily in Florida and Idaho.

72. The principal phosphate fertilizer products include: (a) Diammonium Phosphate (DAP), the world's most widely traded phosphate fertilizer, containing 18% nitrogen and 46% P2O5 (phosphoric acid equivalent), applied at planting for corn, soybeans, wheat, canola, and cotton; (b) Monoammonium Phosphate (MAP), containing 11% nitrogen and 52% P2O5, used much like DAP and often preferred in alkaline soils and for fall application, which held the highest revenue share of phosphate products in 2021; (c) Triple Superphosphate (TSP), containing approximately 46% P2O5, used for high-phosphorus soils and specialty crops; (d) Single Superphosphate (SSP), a lower-concentration product containing 18% to 22% P2O5 used in cost-sensitive markets; and (e) Phosphoric Acid, the industrial intermediate used both in fertilizer manufacturing and in the production of processed foods and industrial chemicals.

73. Four of the five Defendant families maintain a commercial presence in the phosphate segment: Mosaic, Nutrien, Koch, and Yara. Mosaic and Nutrien are the preeminent phosphate producers. Mosaic maintains the largest global production capacity for phosphate fertilizers, and its North American output exceeds the aggregate capacity of its three nearest competitors.

### 3. Potash Fertilizers

74. Potash fertilizers account for approximately 22% of total U.S. fertilizer consumption by volume. Potassium governs water regulation, disease resistance, fruit quality, and overall plant health and, like phosphorus, is removed in significant quantities each harvest. Potash is mined from underground potassium-bearing mineral deposits and is irreplaceable as a crop input.

75. The principal potash fertilizer products include: (a) Muriate of Potash (MOP), also known as potassium chloride (KCl), the most widely used potash fertilizer at approximately 60% K2O content, applied to corn, soybeans, wheat, cotton, and virtually all major row crops; (b) Sulfate of Potash (SOP), a premium product containing 50% K2O and 17% sulfur, used for chloride-sensitive crops such as fruits, vegetables, nuts, and tobacco, where MOP's chloride content would harm yield or quality; and (c) Sulfate of Potash Magnesia (SOPM or K-Mag), a specialty product used on high-value crops that require simultaneous potassium, magnesium, and sulfur supplementation.

76. Nutrien and Mosaic, two of the five Defendant families, produce and sell potash, and together they control the majority of commercially relevant North American potash production capacity. The United States is almost entirely import-dependent for potash, obtaining more than 80% of its supply from Canada. Saskatchewan contains the world's largest known potash reserves, and Nutrien is the dominant producer there, operating six mines with more than 20 million tonnes

of annual production capacity. Mosaic accounts for roughly 35% of North American potash output.

### 4. Fertilizer Used by Farmers

77. Fertilizer costs are among the largest variable expenses American farmers bear, across every crop type, and no commercially viable substitute for nitrogen, phosphate, and potash exists at meaningful commercial scale. That inelastic demand makes the fertilizer market particularly vulnerable to Defendants' abuse.

78. Farmers do not typically purchase raw elemental nitrogen, phosphorus, or potassium, nor do they buy unprocessed ore. They rely instead on finished fertilizer products from producers such as Defendants, chemically processed, granulated, or liquefied so that they can be safely transported, stored, blended, and applied with modern equipment, and engineered to flow through spreaders, dissolve in sprayers, or be injected into soil without damaging equipment or creating safety hazards.

79. Nor can farmers rely on a single-nutrient fertilizer to grow a crop; a farmer cannot, for example, grow corn on nitrogen alone. Farmers instead purchase a mix of single-nutrient fertilizers and multi-nutrient blends depending on crop needs and soil conditions. Single-nutrient fertilizers such as urea, anhydrous ammonia, MAP, DAP, MOP, and SOP supply one primary nutrient at a time and serve as the building blocks for more complex fertilizer programs. Farmers also buy pre-mixed NPK fertilizers containing all three major nutrients in specific ratios. The numbers on an NPK label represent the percentage by weight of nitrogen (N), phosphate (P), and potash (K), so a 20-10-10 blend contains 20% nitrogen, 10% phosphate, and 10% potash, with the remaining 60% composed of filler material that ensures safe handling, prevents clumping, and allows even application across a field.

80. Each nutrient complements the effectiveness and yield contribution of the others applied during a growing season. A farmer therefore cannot respond to a significant, non-transitory price increase in a single-nutrient fertilizer by declining to purchase that nutrient for the season, because doing so would risk lower yields or outright crop failure. Farmers must buy nitrogen, phosphate, and potash fertilizers every growing season to maximize crop yield.

81. Because fertilizers are standardized chemical products, single-nutrient fertilizers with the same formulation are generally interchangeable, regardless of whichever major producer manufactured them. DAP produced by Nutrien, Mosaic, CF Industries, or Koch is chemically the same product and performs the same agronomic function, and the same is true of urea, UAN, MAP, and potash. Pre-mixed NPK fertilizers with identical formulas, such as any 20-20-10 blend, are likewise reasonably substitutable, whether the underlying nutrients originated with Nutrien, Mosaic, or another supplier. Fertilizers with the same nutrient composition are therefore effectively equivalent from the farmer's perspective, competition occurs on price rather than on product differentiation, and a price increase by any one Defendant takes effect immediately against every farmer in the market. No product differentiation would lead a buyer to absorb a higher price from one producer while switching to a lower-priced alternative from another.

**B. U.S. Market Size and Structural Trends over Time**

82. The U.S. fertilizer market is one of the largest in the world, valued at approximately $30 billion in 2025 and projected to reach $40 billion by 2031.

83. U.S. fertilizer consumption has trended significantly upward since 2009, driven by expanding crop acreage, rising yields, and demand for renewable energy feedstocks such as corn ethanol. Total U.S. consumption of nitrogen, phosphate, and potash reached 21 million metric tons in 2013, the highest level since before the 2007 recession, then stabilized at approximately 20 million metric tons through 2020. In 2021, total fertilizer consumption fell 9.4% year over year to

18.3 million metric tons, and it has since rebounded to roughly 20 million metric tons beginning in 2022.

Fig. 1. U.S. Fertilizer Consumption, 2006–2023 (USDA)




84. Decades of consolidation have reduced the number of U.S. fertilizer producers and increased market concentration, and federal investigations and academic analyses have long identified concerns that a shrinking number of firms exercise significant influence over fertilizer pricing. By 2019, just four corporations, CF Industries, Nutrien, Koch Industries, and Yara USA, accounted for 75% of the production and sale of nitrogen-based fertilizer in the United States. The number of firms producing ammonia, a key nitrogen source, has fallen from more than 40 companies in the late 1980s to fewer than 10 today.

Fig. 2. North America Fertilizer Company Consolidation, 1990 v. 2024 (Farm Action)




85. The January 2018 merger of PotashCorp and Agrium, which created Nutrien and was, at the time, the largest corporate transaction in Canadian history, sharply increased concentration in the potash and phosphate markets. The parties proposed it in September 2016, during a period of depressed fertilizer prices, and industry analysts observed that the combined entity would possess substantially greater pricing power. The FTC initially raised competition concerns before approving the transaction in December 2017, conditioning approval on the divestiture of two production facilities, a wholly inadequate remedy. Nutrien emerged as the world's largest potash producer and one of the largest nitrogen and phosphate producers, paving the way for the anticompetitive conduct alleged herein.

86. Mosaic was assembled the same way, from the merger of IMC Global, a dominant North American phosphate producer, and Cargill's crop nutrition division, combining the two largest phosphate operations in North America. Mosaic then methodically eliminated its remaining competition: in 2013 it acquired CF Industries' phosphate operations for approximately

$1.4 billion, removing CF Industries as an independent phosphate competitor, consolidating phosphate capacity, and acquiring CF Industries' Florida phosphate processing infrastructure.

87. Defendants hold dominant market shares, measured by production capacity, in each of the three primary fertilizer types. Four Defendants hold approximately 82% of U.S. nitrogen production capacity; Mosaic and Nutrien together hold more than 90% of North American phosphate capacity; and Nutrien and Mosaic together hold approximately 88% of North American potash capacity. A handful of firms therefore set the price of every fertilizer American farmers need to purchase.

Fig. 3. U.S. Nitrogen Fertilizer Production Capacity: Approximate Market Shares




88. As Figure 3 illustrates, CF Industries is the dominant U.S. nitrogen producer at approximately 39% of total domestic capacity, nearly twice the share of the second-largest producer, and it alone produces more than one-third of all nitrogen fertilizer manufactured in the United States. Nutrien holds approximately 22% and Koch approximately 15%, bringing the three Defendant nitrogen producers to a combined share of approximately 76%; together with Yara at

approximately 6%, the top four firms hold approximately 82% of U.S. nitrogen production capacity. That concentration, combined with high capital barriers to new entry and the energy-intensive cost structure of ammonia synthesis, gives Defendants substantial collective power over domestic nitrogen prices.

89. Defendants also exercised control over nitrogen imported into the United States. In May 2022, Strike, an Australian urea producer, selected Koch Fertilizer, LLC, as the preferred bidder for the offtake of 100% of 1.4 million metric tons per year of urea production.

Fig. 4. North American Phosphate Fertilizer Production Capacity: Approximate Market Shares




90. Figure 4 illustrates the most extreme concentration of any of the three nutrient markets. Mosaic alone controls approximately 80% of North American phosphate fertilizer production, a share so dominant that no other single producer, and no realistic combination of smaller producers, can impose meaningful competitive discipline on its pricing. Nutrien holds approximately 12% of North American phosphate production, and fringe producers hold the remaining 8%.

Fig. 5. North American Potash Fertilizer Production Capacity: Approximate Market Shares




91. Figure 5 shows that Nutrien and Mosaic dominate the North American potash market, holding approximately 53% and 35% of production capacity, respectively, for a combined share of approximately 88%. Small producers split the remaining 12%, primarily Intrepid Potash in the United States, whose capacity is negligible as a competitive constraint. The Nutrien and Mosaic duopoly therefore sets potash prices for every U.S. farmer without facing meaningful domestic competition. As set forth above, the United States obtains more than 80% of its potash supply from Canada, and Nutrien, the world's largest potash producer, controls the majority of Canadian potash export capacity, which gives it an unparalleled ability to manage global potash supply and pricing, a power it exercised throughout the Class Period.

**C. Vertical Integration and Distribution Channel Control**

92. Production-level dominance tells only part of the story. Over decades of mergers and acquisitions, Defendants extended their control far beyond the mine and the manufacturing plant, building vertically integrated systems that reach the farm gate. That integration, spanning production facilities, terminal networks, wholesale distribution, and direct retail, carries pricing

signals and supply discipline strategies directly to end users with no independent intermediary to challenge them. It also gives each Defendant real-time visibility into downstream demand, competitor inventory levels, and retail pricing across the market, a continuous intelligence stream that makes coordinated pricing easier to implement and to monitor, and harder for any deviation to escape detection.

93. Farmers themselves have identified this structure as the source of the problem. In January 2023, the USDA published survey results responding to its Public Request for Information on Access to Fertilizer. Of the 1,494 comments submitted, 87% described concerns about soaring prices and 72% described concerns about the power of fertilizer manufacturers. Farmers attributed price increases to a few unaccountable fertilizer manufacturers that exercise extensive control over retail, transport, and production markets, and over "every step in the process," with one commenter stating that "[e]xcessive price increase of fertilizer appears to be fueled by greed within the small group of fertilizer manufacturers."

94. Commenters explained that some manufacturers operate business lines as both fertilizer seller and retailer buyer, which gives them power to "force other [retailers dependent on the manufacturer's product] to buy at inflated prices." On distribution, the USDA reported one commenter's account that "'large distributors' are 'acquiring small manufacturers'; and 'effectively lock[] up retail locations from being approached' by competitor manufacturers, by 'eliminating competing products from [acquired manufacturers' catalog and consolidate to one product]' and 'forc[e downstream] retail locations to place large minimum orders.'"

**Nutrien**

95. Nutrien is the world's most extensively vertically integrated fertilizer company, and controls its full supply chain from the mine to the farmer's gate: six potash mines in Saskatchewan

with more than 20 million tonnes of annual capacity, approximately 27.5 million tonnes of fertilizer products produced annually, and, through its retail subsidiary Nutrien Ag Solutions, the largest agricultural retail network in the United States, with annual sales exceeding $1 billion from retail operations alone. It accounts for approximately 21% of all U.S. agricultural retail sales and generates a significant majority of its fertilizer sales from its own production, a self-reinforcing structure that entrenches its market power.

96. The anticompetitive significance of that structure is direct. Because Nutrien Ag Solutions retail locations source a significant majority of their fertilizer from Nutrien's own production facilities, when Nutrien raises wholesale fertilizer prices, as it did throughout the Class Period, its retail arm simultaneously transmits those increases to hundreds of thousands of farmers, and no independent retail competitor can undercut it using lower-cost alternative supply. No independent hand touches the increase at any point between Nutrien's mine and the farmer's gate. Nutrien's retail operations also generate granular, real-time visibility into national and regional fertilizer demand, competitor product presence at the farm level, and farmer purchasing behavior, a proprietary intelligence stream that tells Nutrien precisely what the market will bear and whether any competitor is deviating from coordinated price levels. Even as Class Period prices peaked in July 2022, Nutrien continued to expand that integration, announcing the acquisition of Casa do Adubo, a Brazilian retail fertilizer company, and extending its mine-to-farm-gate structure into the Brazilian agricultural market.

**Mosaic**

97. Mosaic is vertically integrated at the production, logistics, and international distribution levels. The merger that created it combined IMC Global's mining and processing operations with Cargill's distribution infrastructure and customer network, giving Mosaic control

over both the production and the downstream delivery of North American phosphate from its first day of operation.

98. Mosaic owns and operates ammonia terminating facilities at the Port of Tampa and Port Sutton, Florida, through which it receives and processes the ammonia inputs to its phosphate manufacturing operations, giving it control over a critical production input that would otherwise depend on third-party infrastructure. Its network of crop nutrient blending and bagging facilities spanning the United States, Canada, Brazil, and other international markets provides downstream reach that independent fertilizer distributors cannot easily replicate. Mosaic's operations run from mine through finished granule and port terminal, a physical infrastructure network that gives it structural advantages over any new entrant attempting to compete from a production-only basis.

**CF Industries**

99. CF Industries operates no consumer-facing agricultural retail network, but it achieves vertical integration through a strategically positioned infrastructure of production facilities, pipeline assets, and distribution terminals that gives it direct control over the movement and pricing of nitrogen fertilizers from production to sale. Its Donaldsonville, Louisiana, complex, the largest ammonia production complex in the world, connects to an extensive pipeline system that feeds nitrogen products directly into the Midwest market. CF Industries has access to a 2,000-mile ammonia pipeline and owns terminal and storage facilities across the Midwestern United States that allow it to supply multiple terminal locations without depending on third-party logistics, including storage and distribution terminals across the Corn Belt and Gulf Coast in which it operates or holds interests.

**Koch**

100. Koch is similarly vertically integrated. It owns a major ammonia pipeline running from Gulf Coast production facilities into the Corn Belt, along with the ammonia terminals connected to it, infrastructure that gave Koch control over critical last-mile nitrogen delivery before Koch was even a primary nitrogen producer. In 2022, Koch acquired 50% interest in Jorf Fertilizers Company III, part of the world's largest phosphate mining group.

101. Koch continued its vertical expansion in 2024 by completing the acquisition of a nitrogen fertilizer plant in Wever, Iowa. The acquisition gave Koch control of the largest nitrogen facility in the world and disappointed lawmakers and farmers who had hoped for more competition to hold prices down. Koch also maintains a global network of more than 50 terminals that lets it source product from its own facilities or from third-party suppliers and direct supply toward whichever market presents the most favorable pricing opportunity at any given time, and thereby manage supply levels and support supracompetitive prices in target markets.

**Yara**

102. Yara achieves vertical integration in the U.S. market through its ownership and operation of the Freeport, Texas, nitrogen production complex and a network of distribution terminals across the United States and Canada. Yara North America's terminal network lets it control the timing and pace of product releases into the domestic market, the same structural ability to manage supply and support price levels that characterizes the vertical infrastructure of its co-conspirators. As the world's largest nitrogen fertilizer producer, Yara can also source product from its global production network and direct it toward, or withhold it from, the U.S. market depending on pricing conditions, which gives it leverage over domestic nitrogen prices well beyond its Freeport capacity. Yara North America's direct-to-retailer distribution relationships

likewise provide access to the same downstream commercial intelligence about demand, inventory, and competitor pricing that its co-Defendants obtain through their own vertically integrated distribution systems, further enabling coordinated conduct.

### D. Defendants' Conspiracy Drove Fertilizer Prices to Supracompetitive Levels that Cannot Be Explained by Supply and Demand or Other Legitimate Market Forces

#### 1. Defendants' Parallel Pricing Caused Fertilizer Costs to Skyrocket

##### a. The Price Surge: Magnitude, Synchrony, and Persistence

103. Fertilizer prices vary cyclically with global supply, energy costs, and crop demand. The increases that began in early 2021 and accelerated through 2021 and 2022 were different: extraordinary in scale, simultaneous across all three nutrient categories, and persistent long after every conventional cost-based explanation had been exhausted. Figure 6 below charts the monthly average U.S. price per metric ton for DAP, urea, potash (MOP), and anhydrous ammonia from 2019 through 2025, with dotted horizontal reference lines marking each product's 2019 pre-conspiracy baseline price.

Fig. 6. U.S. Fertilizer Prices, 2019–2025[3]




104. All four fertilizer products moved in synchrony through the same four phases: relative calm in 2020; sharp, coordinated escalation beginning in 2021; a peak in early-to-mid 2022 at prices that were multiples of the pre-conspiracy 2019 baselines; and a partial decline that never returned prices to baseline. Four distinct products tracked one another through the same inflection points with near-identical timing, a hallmark of coordinated market behavior rather than independent responses to separate competitive forces.

105. Throughout 2020, prices for all four products remained near or below their 2019 baselines. The shock began in early 2021. By January 2022, anhydrous ammonia had reached $1,497/ton, a 163% premium over the 2019 baseline, and it peaked at $1,636/ton in June 2022, a 188% premium. Urea surged to $1,027/ton in April 2022, a 155% premium. DAP peaked at

---

[3] USDA Agricultural Marketing Service (AMS), Illinois Production Cost Report (Bi-weekly). All prices in USD per short ton, Illinois statewide average, FOB distributor. Dashed lines mark each product's 2019 annual average baseline.

$1,028/ton in June 2022, a 110% premium over baseline. Potash peaked at $864/ton in June 2022, a 125% premium. All four products reached their peaks within the same narrow window between April and June 2022.

106. That synchronization across all three fertilizer nutrients, nitrogen (anhydrous and urea), phosphate (DAP), and potash (MOP), within the same three-month window constitutes powerful circumstantial evidence of coordinated pricing. Those products have entirely different feedstock inputs, production processes, and global trade dynamics. No natural market mechanism, not weather, not a single input-cost shock, not any discrete geopolitical event, simultaneously accelerated the prices of a natural-gas-intensive product (ammonia and urea), a sulfuric-acid- and phosphate-rock-intensive product (DAP), and a mining-intensive product (potash) within the same three months. Russia's invasion of Ukraine on February 24, 2022, the geopolitical disruption most likely to be offered as an alternative explanation, cannot account for prices that had already doubled or tripled from their 2019 baselines before a single Russian soldier crossed the border: by the time of the invasion, anhydrous ammonia had already risen 163% above its 2019 baseline, urea had more than doubled, and DAP had surged more than 80%.

107. The Ukraine invasion also cannot explain 2022 prices for a more fundamental reason: farmers do not purchase fertilizer on the spot market at planting time. They routinely contract for the following season's needs months in advance, with approximately 80% of farmers locking in their fertilizer prices in the fall preceding the planting year. Fertilizer applied during the 2022 growing season was purchased in 2021, before the invasion occurred. The USDA reached the same conclusion, finding that "many U.S. producers were able to avoid the later surge in fertilizer prices caused by Russia's invasion of Ukraine, because fertilizers for 2022 plantings were purchased in 2021." The war, in short, cannot explain the prices that farmers actually paid. The

only mechanism capable of producing such synchronized escalation across independent industrial processes is the conspiracy among Defendants, who collectively control the pricing of all NPK fertilizers in the U.S. market.

108. The post-peak behavior of prices is equally probative of coordination. After reaching their 2022 highs, prices declined through 2023 and into 2024, but none returned to pre-conspiracy levels. By December 2024, anhydrous ammonia stood at $692/ton, 22% above the 2019 baseline of $569/ton; urea at $538/ton, 34% above its 2019 baseline of $402/ton; DAP at $724/ton, 48% above its 2019 baseline of $489/ton; and potash at $456/ton, 19% above its 2019 baseline of $384/ton. The descent was also far more gradual than the ascent: ammonia took more than two years to fall from its $1,636 peak into the $700 range, and it remained above $1,000/ton through at least mid-2023.

109. Then, in 2025, rather than completing their return to competitive equilibrium, prices resumed an upward trajectory across all four products at once. Anhydrous ammonia climbed from $722/ton in January to $844/ton by December 2025; urea rose from $538/ton to $599/ton; DAP rose from $726/ton to $861/ton; and potash increased from $457/ton to $496/ton. This pattern of partial retreat followed by renewed coordinated escalation is the hallmark of an ongoing conspiracy, not of a competitive market.

110. These inflated prices persist, and they are harming American farmers now. Farmer bankruptcies in the United States rose 46% in 2025. In July 2025, the Argus Fertilizer affordability index stood at 0.71, "well below the baseline of 1," meaning that a farmer had to sell 206 bushels of corn to afford one short ton of DAP, compared with the historical average of 133 bushels.

**b. Defendants Implemented Parallel Price Increases and Inflated Prices to Supracompetitive Levels During the Class Period**

111. Defendants' public financial disclosures show that they executed price increases in parallel. Average realized prices for nitrogen, phosphate, and potash products moved in near-perfect parallel across Nutrien, CF Industries, and Mosaic from 2021 through 2025, each product peaking within the same narrow window and each Defendant's prices tracking its competitors with a precision irreconcilable with independent competitive pricing.[4] Figure 7 below plots those movements.

Fig. 7. Defendants' Averaged Realized NPK Fertilizer Prices, 2018–2026[5]




112. Additionally, Bloomberg's Green Markets reports ("Green Markets")—a weekly fertilizer industry trade publication—provide contemporaneous evidence of Defendants'

4 Koch Fertilizer is a private company and Yara International is a foreign entity; neither disclose price data.

5 For Nutrien, the analysis covers average realized prices across all three of its primary fertilizer product lines—potash, phosphate, and nitrogen. The potash price data reflects North American sales only, consistent with Nutrien's segment reporting. Nutrien's phosphate price data

coordinated pricing conduct that corroborates the parallel pricing demonstrated by Defendants' own financial disclosures. As documented in Green Markets' reporting throughout the Class Period, Defendants repeatedly made parallel pricing announcements, across multiple fill cycles, nutrient categories, and geographic markets within the United States. These episodes confirm that the parallel pricing reflected in Defendants' SEC filings was not a statistical artifact, but that it was the product of repeated coordinated pricing.

113. Nutrien and Mosaic, which together control more than 90% of North American potash and phosphate production capacity, reported average realized prices that tracked each other almost exactly throughout the Class Period.

reflects the entire company, as its phosphate operations are heavily concentrated in North America and supplemented by exports to global agricultural markets. Nutrien's nitrogen price data likewise reflects the entire company; however, Nutrien sells the substantial majority of its nitrogen products within North America, making its total nitrogen figures a reliable proxy for its North American market pricing.

For Mosaic, the price analysis is limited to Mosaic's North America segment—which encompasses its potash and phosphate sales operations in the United States and Canada—and excludes Mosaic's South America segment, known as Fertilizantes, which operates as a distinct regional business serving different agricultural markets. The North America segment does include a portion of exports to Asia, but the dominant share of its sales activity is directed to North American agricultural markets.

For CF Industries, the analysis reflects average realized prices across the entire company's nitrogen product lines. CF Industries is the most geographically concentrated of the three public Defendants, with the substantial majority of its production and sales conducted in North America; the United States typically accounts for the largest share of CF Industries' sales volumes. CF Industries does operate nitrogen production assets in the United Kingdom and sells that product into European markets, but those operations represent a modest share of total company output and do not materially affect the North American pricing trends documented herein.

Fig. 8. Nutrien v. Mosaic Average Realized Potash Fertilizer Prices, 2018–2026




114. Nutrien's average realized potash price rose from $192/MT[6] in Q4 2020 to $684/MT in Q1 2022, a 256% increase over six quarters. Mosaic's average realized potash price rose from $176/MT to $582/MT over the same six quarters, a 231% increase. Both producers reached their absolute peak in the identical quarter: Nutrien at $729/MT and Mosaic at $678/MT in Q2 2022, a spread of only 7.5% between the two dominant producers at the height of the market.

115. According to Green Markets, on June 22, 2022, Mosaic announced that its potash prices were $100 to $120/MT higher in the second quarter of 2022 than in the first. Potash fill pricing at Midwest terminals for orders placed by August 3, 2022, ranged from $760 to $765/st. "After that date, both Nutrien and Mosaic said pricing for new orders will be up $35/st." On December 16, 2022, NOLA potash barge prices were falling to $480 to $490/st from $490 to $500/st the previous week, but Mosaic posted its NOLA-equivalent price at $500/st to push prices

6 "/MT" means per metric ton.

back up. On January 27, 2023, the potash market in the Northeast United States stood at $470 to $495/st, "with the upper end reflecting Nutrien's posted fill level in mid-January." Nutrien and Mosaic did not merely price in parallel: on Nutrien's Q1 2024 earnings call, an analyst "noticed that Mosaic and [Nutrien] had identical messaging on potash pricing."

116. As of Q2 2026, Nutrien's average realized potash price of $295/MT remained 31% above its pre-conspiracy Q4 2019 baseline of $226/MT, and Mosaic's price of $275/MT remained 23% above its Q4 2019 baseline of $224/MT. Two dominant potash producers pricing independently would have strong incentives to undercut each other to capture share at historically profitable prices. Instead, their average realized prices moved in lockstep throughout the conspiracy period, rising together, peaking together, and declining together, without meaningful divergence.

117. The same pattern holds for phosphate.

Fig. 9. Nutrien v. Mosaic Average Realized Phosphate Fertilizer Prices, 2018–2026




118. Nutrien's average realized phosphate price rose from $305/MT in Q1 2020 to a peak of $888/MT in Q2 2022, a 191% increase. Mosaic's rose from $274/MT to a peak of $920/MT over the same period, a 236% increase. Both producers reached their absolute peak in the identical quarter.

119. On June 22, 2022, Mosaic announced that its phosphate prices were $130/MT to $150/MT higher in the second quarter of 2022 than in the first.

120. As of Q2 2026, Nutrien's average realized phosphate price of $719/MT remained 115% above its pre-conspiracy Q4 2019 baseline of $334/MT, and Mosaic's price of $773/MT remained 191% above its Q4 2019 baseline of $266/MT. The lowest post-peak phosphate price that either producer recorded was Nutrien's $472/MT in Q3 2023, still 43% above Nutrien's 2020 average of $330/MT, and Mosaic's post-peak low of $487/MT in Q3 2023 remained 83% above its Q4 2019 baseline.

121. The nitrogen price data tells the same story across two independent producers, Nutrien and CF Industries, and price announcements show that Koch joined them.

Fig. 10. Nutrien v. CF Industries Average Realized Ammonia Fertilizer Prices, 2018–2026




122. Nutrien's average realized ammonia price rose from $216/MT in Q4 2020 to a peak of $1,157/MT in Q2 2022, a 436% increase. CF Industries' average realized ammonia price rose from $273/MT to a peak of $1,077/MT over the same period, a 294% increase. Both producers reached their absolute peak in the same quarter, separated by only $80/MT, approximately 7%, between the two largest U.S. nitrogen producers.

123. From Q1 2021 through Q4 2022, Nutrien and CF Industries moved their ammonia prices in the same direction in six of seven consecutive quarterly transitions. The single divergent quarter, Q3 2022 to Q4 2022, when Nutrien declined from $927/MT to $887/MT while CF Industries rose from $826/MT to $898/MT, reflects convergence from slightly different post-peak trajectories rather than genuine competitive differentiation.

124. Green Markets reporting shows that Koch priced in parallel alongside Nutrien and CF Industries. On December 9, 2022, ammonia prices ranged from $1,210/st to $1,260/st in the Western Cornbelt (Iowa, Nebraska, and South Dakota), with "the high reflecting the last offers from Koch and CF terminals." As fertilizer prices fell in 2023 from their 2022 peak, Defendants coordinated their pricing to hold prices above competitive levels. On February 8, 2023, CF Industries and Koch both posted ammonia prices for March through June shipments to terminals in Indiana and Illinois (the "Eastern Cornbelt") at $840 to $850/st. On March 8, 2023, CF Industries and Koch both posted ammonia prices of $725/st for terminals in Indiana and Illinois.

125. Even during the price decline, Defendants successfully coordinated to push fertilizer prices up. According to Green Markets, "[a]mmonia prices firmed to $465-$485/st FOB in the Eastern Cornbelt for prompt or prepay tons, up from $445-[$]455/st FOB last week, with the low reflecting new offers from Koch on July 24 FOB Wood River, Ill. CF [Industries] reportedly followed on July 25, pushing its prices to $480/st FOB in Illinois and $485/st FOB in Indiana, with Nutrien reposting at $485/st FOB Lima, Ohio."

126. In that sequence the price rises as Defendants post in succession. In a competitive market, the follower undercuts the leader to capture share; here, CF Industries followed Koch and raised the price, and Nutrien followed CF Industries and matched the ceiling.

127. Defendants continued to raise prices in succession in 2024 while withholding supply in concert. On March 8, 2024, Green Markets reported that CF Industries "raised [ammonia] prices first to $635/st FOB and then to $645/st FOB in the [Eastern Cornbelt] region, while Koch was quoted at the $635/st FOB level at most terminals." On June 20, 2024, CF Industries and Koch announced July and August ammonia fill program offers of $410/st at terminals in Illinois and Indiana and $390/st to $395/st in the Western Cornbelt. On June 25, 2025,

CF Industries and Koch both launched summer fill and fall prepay ammonia prices of $560/st for June through August and $640/st for October through December.

128. As of Q2 2026, Nutrien's average realized ammonia price of $609/MT remained 149% above its pre-conspiracy Q4 2019 baseline of $245/MT, and CF Industries' price of $677/MT remained 146% above its Q4 2019 baseline of $275/MT. The lowest post-peak ammonia price that either producer recorded was Nutrien's $272/MT in Q3 2023, which still exceeded Nutrien's full-year 2020 average of $221/MT by 23%, and CF Industries' post-peak low of $308/MT remained 16% above its 2020 average.

129. From Q1 2021 through Q2 2026, the average quarterly ammonia price difference between Nutrien and CF Industries narrowed to approximately $40/MT, down from approximately $53/MT during the pre-conspiracy period from Q1 2018 through Q4 2020, a tightening of competitive alignment that occurred precisely as prices tripled and the financial incentive to undercut a competitor was greatest.

Fig. 11. Nutrien v. CF Industries Average Realized Urea Fertilizer Prices, 2018–2026




130. For urea, Nutrien's average realized price rose from $270/MT in Q4 2020 to a peak of $783/MT in Q1 2022, a 190% increase. CF Industries' average realized urea price rose from $247/MT to a peak of $705/MT in Q2 2022, an 185% increase, with both producers reaching their peaks within one quarter of each other.

131. From Q1 2021 through Q4 2022, Nutrien and CF Industries moved urea prices in the same direction in six of seven consecutive quarterly transitions. As of Q2 2026, Nutrien's average realized urea price of $620/MT remained 123% above its pre-conspiracy Q4 2019 baseline of $278/MT, and CF Industries' price of $593/MT remained 140% above its Q4 2019 baseline of $247/MT. The lowest post-peak urea price that either producer recorded was CF Industries' $330/MT in Q3 2024, still 36% above CF Industries' full-year 2020 average of $242/MT, and Nutrien's post-peak low of $396/MT remained 42% above its Q4 2019 baseline.

132. Across every product, every Defendant with available pricing data, and every fertilizer nutrient category, average realized prices failed to return to competitive levels despite the

near-complete normalization of input costs by 2023 and 2024, which confirms that the supracompetitive pricing documented in Defendants' own financial statements reflects persistent coordinated market power rather than temporary responses to exogenous cost shocks.

**c. Defendants' Parallel Pricing During the Class Period Is Proven by Statistical Analysis**

133. The parallel pricing documented in Defendants' own SEC filings is not merely a visual pattern. Standard econometric analysis of their average realized price data across all four product categories demonstrates it statistically, and confirms that Nutrien, CF Industries, and Mosaic priced their fertilizer products in near-perfect coordination throughout the Class Period.

134. The most fundamental measure of pricing coordination is the Pearson correlation coefficient, which measures the degree to which two variables move together over time: 1.0 indicates perfect parallel movement, and 0.0 indicates no relationship. In competitive commodity markets characterized by independent pricing, correlations between competing producers' prices typically range from 0.3 to 0.7, reflecting the normal influence of shared input costs and broad market trends while still capturing meaningful independent price variation. The correlations between Defendants' average realized prices for the same product far exceed that competitive benchmark in every product category. For ammonia, the correlation between Nutrien's and CF Industries' average realized prices across the Class Period is 0.988, near-perfect parallel pricing. For urea it is 0.985. For potash, the correlation between Nutrien and Mosaic is 0.977. For phosphate, it is 0.988. Every product comparison produces a correlation above 0.97, which confirms that these companies were not pricing independently of one another.

135. Quarter-over-quarter directional analysis reinforces this conclusion. Two producers pricing independently would be expected to move prices in the same direction in approximately 50% of quarters, the baseline probability of a random directional match. Nutrien

and CF Industries moved ammonia prices in the same direction in 30 of 33 comparable quarters, a match rate of 90.9%, and urea prices in the same direction in 29 of 33 quarters, a match rate of 87.9%. Nutrien and Mosaic moved potash prices in the same direction in 25 of 29 quarters, 86.2%, and phosphate prices in 28 of 29 quarters, 96.6%. Match rates of 86% to 97% against a competitive baseline of 50% confirm that Defendants' quarterly pricing decisions were not independent.

136. Price gap stability supplies a third and independently probative measure of coordination. In competitive markets, the price gap between two producers of the same fungible commodity fluctuates significantly over time as each responds to its own cost pressures, capacity utilization, and competitive position; a stable, narrow gap that persists across years and across dramatically different absolute price levels is inconsistent with independent pricing. In every product comparison, the price gap between Defendants remained remarkably stable throughout the Class Period.

137. For ammonia, the mean price gap between Nutrien and CF Industries was $40/MT, representing a mean percentage gap of only 7.3%, with a coefficient of variation of 0.75, indicating that the gap was not only narrow but stable relative to its mean. For urea, the mean gap was $57/MT at 12.2%, with a coefficient of variation of 0.49. For potash, the mean gap between Nutrien and Mosaic was $47/MT at 14.4%.

138. For phosphate, where Mosaic produces nearly five times Nutrien's volume, the mean gap was only $27/MT, a mean percentage gap of just 4.0%, with a coefficient of variation of only 0.68. Two producers whose output differs by a factor of nearly five maintained an average price gap of less than 5% across 29 quarters, a span in which their absolute prices ranged from approximately $266/MT to $920/MT. Pricing alignment that narrow between producers of

fundamentally different scale is not a feature of competitive markets;it is the signature of coordination.

139. Key pricing episodes during the Class Period further illustrate the coordinated nature of Defendants' conduct. From Q1 2021 through Q4 2021, the initial escalation phase of the conspiracy, Nutrien raised its average realized ammonia price from $278/MT to $656/MT, a 136% increase, while CF Industries simultaneously raised its ammonia price from $302/MT to $659/MT, a 118% increase over the same four quarters. Both producers then reached their absolute ammonia price peaks in the identical quarter, as set forth above, and neither attempted to capture share by undercutting the other at the peak. The descent was equally synchronized: from Q3 2022 through Q4 2023, Nutrien's ammonia price fell from $927/MT to $416/MT while CF Industries' fell from $826/MT to $460/MT over the same six quarters, and neither producer cut aggressively to gain share.

140. The urea episode mirrors the ammonia pattern precisely. From Q1 2021 through Q4 2021, Nutrien raised urea prices from $329/MT to $670/MT, a 104% increase, while CF Industries simultaneously raised urea prices from $302/MT to $650/MT, a 115% increase, near-identical escalation in a product whose price should, in a competitive market, turn on each producer's independent cost and capacity position.

141. For potash and phosphate, Nutrien and Mosaic prices surged 55% to 70% in near unison over the eight quarters from Q1 2021 through Q4 2022, even though the two operate mines and production facilities with entirely different cost structures, geographies, and operational circumstances. The most recent data, from Q1 2025 through Q2 2026, confirms that the conspiracy remains ongoing: Nutrien maintained ammonia prices between $400/MT and $609/MT while CF

Industries maintained prices between $418/MT and $677/MT—continued price discipline with minimal competitive divergence.

142. Taken together, the price correlation, directional synchronization, price gap stability, and key episode analyses constitute a statistically rigorous and mutually reinforcing body of evidence that Defendants' Class Period pricing was coordinated rather than independent. No combination of shared input costs, common demand conditions, or rational oligopolistic awareness can explain correlation coefficients above 0.98, directional match rates above 87%, and mean price gaps below 12% between producers whose production levels, cost structures, and operational circumstances differed materially throughout the period. Defendants priced their fertilizer products in coordination, not in competition.

**d. Raw Material and Supply Chain Costs Cannot Explain the Dramatic Price Surge**

143. Defendants have at times attributed Class Period prices to a series of overlapping supply shocks: the February 2021 Texas winter storm (Winter Storm Uri) that froze natural gas wells and briefly curtailed ammonia production; European energy-crisis-driven nitrogen plant curtailments in late 2021 and 2022; E.U. and U.S. sanctions on Belarus beginning in August 2021 that disrupted approximately 20% of global potash exports; Chinese export restrictions on phosphate and urea imposed in the second half of 2021; and the Russian invasion of Ukraine in February 2022, which disrupted ammonia, urea, and potash supply chains. Those events occurred and may have caused some price effects. But the empirical comparison of cost movements against price movements illustrated in Figure 12 below demonstrates that none of them, alone or in combination, can account for what actually happened to fertilizer prices. At best, they supplied a convenient pretext for price increases caused by Defendants' underlying conspiracy.

144. Natural gas is the dominant variable-cost input for nitrogen fertilizers. When natural gas prices were high in 2021, CF Industries CEO W. Anthony Will admitted that "the steeper global cost curve increased margin opportunities for low-cost producers such as CF" and other major fertilizer producers. Yet throughout the Class Period, Defendants publicly attributed fertilizer price increases to rising natural gas costs. Figure 12 tests that claim directly, quantifying the disconnect between natural gas input costs and urea prices in the U.S. market and demonstrating that Defendants' cost-pass-through explanation cannot account for either the magnitude or the persistence of the Class Period price increases.

Fig. 12. Actual United States Urea Prices vs. Expected Urea Prices Based on World Natural Gas Costs, 2019 to 2026[7]




[7] Figure 12 uses an index of Bloomberg series GCFPURCA, GCFPURCD, GCFPURWC, GCFPURWS, GCFPURGI, GCFPURMC, GCFPURNP, GCFPURND, GCFPURNE, GCFPURPD, GCFPURPW, GCFPURSC, GCFPURSE, GCFPURSP, and GCFPURGL from April 2019 to December 2025 and BLS series PNGASEUUSDM. The Urea price index is regressed on

145. Figure 12 compares actual U.S. urea prices paid by fertilizer purchasers (red line) with the price urea should have cost based on the price of natural gas, the primary raw material used to produce it (blue line). The shaded gray area between the two lines represents the portion of urea prices that natural gas costs cannot explain. Across the Class Period, the U.S. urea price exceeded the price predicted by natural gas input costs by an average of $122.88 per ton, a persistent gap borne across the millions of tons of urea sold to American purchasers.

146. From 2019 through 2020, before the conspiracy, the model behaved exactly as expected in a competitive market: the red and blue lines moved together, both fluctuating between roughly $275 and $350 per ton, with actual prices running slightly above the gas cost prediction at times and slightly below at others, normal and short-lived deviations consistent with competitive commodity pricing.

147. That pattern broke in early 2021, when actual urea prices diverged sharply from the cost-predicted price. By mid-2022, some fertilizer purchasers were paying nearly $1,000 per ton for urea even though natural gas costs justified only about $650 per ton, a gap of roughly $350 per ton. Rising natural gas costs, the justification Defendants repeatedly offered for the 2021 and 2022 price spikes, explain only a fraction of the increase; the remainder reflects a substantial and sustained departure from competitive market behavior.

148. What happened after the 2022 peak is more telling still. Natural gas prices fell sharply through 2023 and 2024, and the gas-cost-predicted urea price dropped accordingly, to roughly $350 to $375 per ton, yet actual urea prices remained between $400 and $530 per ton, a persistent premium of $50 to $150 per ton for two consecutive years. In 2025, the gap widened:

---

the world natural gas price index for 2019 and 2020, which is then projected using the estimated coefficients for the full time period.

actual urea prices rose to $470 to $620 per ton while cost-predicted prices held at roughly $350 to $375 per ton, despite moderate natural gas prices and fully normalized supply chain conditions.

149. A temporary cost shock produces a gap that narrows over time, however, a coordinated pricing strategy produces a gap that persists, or grows. Defendants priced urea far above cost-justified levels for years, creating a sustained and expanding margin that natural gas costs cannot explain.

150. Independent economic research reaches the same conclusion. In 2024, economists at Texas A&M University's Agricultural and Food Policy Center published a paper examining fertilizer market conditions and concluded that "increases in the cost of natural gas prices explained less than 20% of the increase in fertilizer prices paid by producers in 2022." At a May 12, 2026 hearing of the U.S. Senate Agriculture Committee concerning high fertilizer prices, Trent Kubik, President of the South Dakota Growers Association, cited a 2021 study by the Texas A&M University Agricultural and Food Policy Center concluding that "[t]he suggestion that recent increases in the price of natural gas are the primary reason for recent increases in the prices of nitrogen products is highly suspect." According to Mr. Kubik's testimony, the study offered the following example: "the price of Anhydrous Ammonia increased $688 per ton from the end of 2020 through the end of October 2021," while "the increase in the value of the embedded natural gas accounts for only $102 (or 15%) of that increase," and "once the value of natural gas in a ton of AA has been subtracted from the AA price, the residual tends to closely track the price of corn, albeit on different scales."

151. Defendants' own financial reports concede the minimal impact of increased natural gas prices. Yara's 2021 third quarter report stated that the rise in natural gas prices had a "limited" "impact on finished fertilizer production." Yara reported in its 2022 quarterly reports that it

enjoyed similarly inflated profit margins because of “higher ammonia prices” and “higher production margins on ammonia.”

152. In May 2022, Nutrien likewise reported increased profitability in its Nitrogen segment, which it attributed to “[h]igher net realized selling prices [that] more than offset higher natural gas costs.”

153. In its 2022 Annual Report, CF Industries reported a 265% increase in net earnings from 2021 to 2022, which it claimed was “due primarily to higher average selling prices, partially offset by higher natural gas costs,” i.e., an admission that it raised prices above input costs.

154. Defendants also admit that they use natural gas derivatives and other financial mechanisms to hedge against increased natural gas prices. In 2024, for example, CF Industries acknowledged that it “utilize[s] natural gas derivatives to hedge [its] financial exposure to the price volatility of natural gas[.]” Mosaic similarly discloses in its annual reports that it uses “financial derivative contracts to manage the pricing on portions of our natural gas requirements” and that its “natural gas derivatives are used to manage the risk related to significant price changes in natural gas.” Yara goes further still, disclosing that it “minimize[s]” its energy risk through “global purchasing activities” and that at some of its plants it has “the operational flexibility to reduce gas purchases and import ammonia for fertilizer production if gas prices peak.” Yara further acknowledges that it “benefit[s] from a natural hedge in the correlation between nitrogen fertilizer prices and global energy prices.” That admission—that Yara’s own financial position benefits from the same correlation between energy costs and fertilizer prices that Defendants publicly cite as the cause of price increases—confirms that rising natural gas prices were not a burden Defendants were forced to pass through, but a market dynamic their pricing strategies were engineered to exploit.

155. Figure 13 plots the standardized regression coefficients from nested ordinary least squares models regressing CF Industries' average quarterly realized ammonia and urea prices on Nutrien's average quarterly realized price and the Henry Hub natural gas index, covering 32 quarterly observations from 2018 through 2025. Nutrien's realized price alone explains 98.1% of the variation in CF Industries' quarterly ammonia price and 97.0% of the variation in its urea price. Natural gas alone explains only 66.1% of the ammonia price path and 57.0% of the urea price path. When both variables are included, adding natural gas to a model that already contains Nutrien's price yields no statistically significant improvement in fit for ammonia (incremental p-value = 0.677) and only a modest improvement for urea ($p = 0.0008$), where the Nutrien-only $R^2$ was already 0.970. The standardized coefficient on Nutrien's realized price is approximately 1.0 standard deviation of CF Industries' price per one-standard-deviation increase in Nutrien's price for both products, while the coefficient on natural gas is near zero for ammonia and small for urea. Nutrien's price thus accounts for substantially all of the statistical fit that natural gas provides, and then some: CF Industries' nitrogen prices track Nutrien's with a precision that natural gas cost pass-through alone cannot explain.

Fig. 13. CF Industries Nitrogen Price Regression, 2021-2025




156. This imbalance extends beyond natural gas and nitrogen. It is widely recognized that phosphate and potash fertilizer product prices "are less closely linked to natural gas than are prices for nitrogen fertilizers." Yet phosphate and potash prices rose alongside nitrogen prices, where the cost-input calculations are inexplicable for those nutrients as well.

157. In June 2022, for example, Peruvian farmers asked Peruvian authorities to renegotiate the Bayovar mine phosphate deposit contract. The Bayovar concessionaire is Miski Mayo, an entity controlled by Mosaic. Climaco Cardenas, President of the agricultural association Conveagro, stated that "[t]hey pay $2.90 for one ton of phosphate rock, and we pay $900 per ton of fertilizer." That is a markup of more than 300 times the cost of the raw input to phosphate.

158. Mosaic admitted in 2022 that although it paid $840 million more for the raw materials used in phosphate fertilizer production, sulfur and ammonia, the gross profit margin of its Phosphates segment had increased by approximately $500 million since 2021. Nutrien likewise reported that profitability in its Phosphate segment increased in 2022 primarily because of "higher

net realized selling prices" for phosphate fertilizer products, which more than offset increases in production costs.

159. Nutrien and Mosaic reported similar disparities between their sales price increases and their input costs for potash. Mosaic reported that its Potash segment's MOP selling price rose to $666 per ton in Q3 2022 from $290 per ton in Q3 2021, while its gross margin per ton rose to $373 from $131. Mosaic simultaneously admitted that its cost of production rose only modestly, from $67 per ton in 2021 to $78 per ton in 2022 and conceded that a portion of that increase consisted of "higher price-related royalties," i.e., a byproduct of its own increased prices.

160. Nutrien's 2022 Annual Report tells the same story. The company attributed its year-over-year 2022 EBITDA gains in the Potash segment to higher sales prices while acknowledging that the bulk of its increased costs were royalties tied to those higher prices: its per-ton "cost of product manufactured" for "Natural gas costs and carbon taxes" rose modestly from $51 million in 2021 to $62 million in 2022, a 21% increase, while "royalties" linked to increased sales prices rose from $107 million to $190 million, a 77.5% increase. Supply chain, transportation, and logistics disruptions likewise fail to explain the price increases in NPK Fertilizer Products. The disruptions Defendants have invoked in their public statements share a common deficiency: each was temporary or limited in scope, yet the pricing effects persisted years beyond the underlying event. Winter Storm Uri struck in February 2021 and lasted less than a week. Chinese fertilizer export restrictions began in mid-2021 but primarily affected trade flows to Asia and Latin America; the United States produces the vast majority of its phosphate domestically through Mosaic and imports virtually none from China. Belarus potash sanctions disrupted some global trade routes but did not eliminate supply, because Belarus and Russia found alternative export channels. And as set forth above, fertilizer prices had already doubled or tripled

from their 2019 baselines before the February 24, 2022 invasion of Ukraine. None of these disruptions explain why, by late 2024, with natural gas prices below 2019 levels and no new supply shocks, all four fertilizer products remained 19% to 76% above their pre-conspiracy baselines and were rising again. Temporary supply disruptions do not produce permanent price floors and to the extent that supply disruptions caused increased prices in the United States, the evidence in Section IV(E) below shows that Defendants themselves were the authors of those disruptions.

#### e. Defendants Pegged Their Prices to Farmers' Maximum Ability to Pay, Not to Legitimate Market Forces

161. Perhaps the most economically revealing feature of Defendants' pricing conduct is the systematic correlation between fertilizer prices and corn prices during the Class Period. That correlation is the product of Defendants' common shift to an ability-to-pay pricing model.

162. In a competitive market, the price of a commodity such as fertilizer is determined primarily by the cost of production, natural gas for nitrogen, phosphate rock and sulfuric acid for DAP, and mining and processing costs for potash, not by what farmers can afford to pay. If the fertilizer market were truly competitive, the price of fertilizer would not systematically track the price of downstream crops such as corn, because a corn farmer's profitability does not change Defendants' cost of production, such as the cost of synthesizing ammonia from natural gas. In a competitive industry, no producer can charge more than its cost plus a normal return, because rivals would undercut it and capture its customers.

163. Yet according to the USDA, fertilizer price increases from 2021 to 2022 added an estimated $128,000 in costs per farm for feed grain operations in 2022.

164. A coalition of 24 agricultural organizations, including the Indiana, Ohio, and Wisconsin Farmers Unions, submitted formal comments to the USDA documenting their finding that fertilizer companies peg prices to the sale price of grain rather than to production costs: "In

effect, these corporations are tying the price of their products to the farmer's ability to pay, rather than to supply and demand—which equates to an abuse of the market. Such abuses allow concentrated corporations to extract maximum profit out of the supply chain, leaving the farmer with no hope of profitability." That practice severs the link between raw material costs and Defendants' finished product prices.

165. One farmer told the USDA directly: "The price of fertilizer today is set by the producers depending on what the price of corn and beans happens to be." That observation matches what economic theory predicts when a firm with market power practices demand-based pricing, pricing not to cost but to what the market will bear.

166. A 2022 Farm Action Special Report found that "[w]hat appears much likelier than global shortages is that [Fertilizer] price hikes are aligned with the rising prices farmers are able to get their grain harvests[,]" and concluded that "[i]f these corporations are tying the price of their products to the farmer's ability to pay, rather than to supply and demand, that equates to an abuse of the market."

167. A 2024 peer-reviewed study published in the Journal of the Agricultural and Applied Economics Association (Wongpiyabovorn et al., 2024) examined five structural breaks in the relationship between natural gas, corn, and fertilizer prices from 1997 to 2022. The study found that pass-through rates of natural gas price changes to fertilizer prices shifted significantly after the biofuel mandate era, and it identified demand-side pressures driven by corn prices as significant drivers of fertilizer pricing in multiple structural periods, reflecting fertilizer producers' ability to extract rents tied to crop profitability rather than to their own production costs.

168. Consistent with that ability, nitrogen fertilizer manufacturer prices correlate more strongly with corn prices during the Class Period than they did during the preceding period from December 2014 through December 2020.[8]

169. Defendants have publicly attributed the Class Period price increases in part to increased demand driven by rising crop prices: higher corn and soybean prices, they contend, gave farmers an incentive to plant more acres, which increased fertilizer demand and justified higher fertilizer prices. The empirical record contradicts that defense. Three independent lines of publicly available USDA data demonstrate that demand shifts cannot explain the magnitude, duration, or pattern of the Class Period price increases.

170. First, U.S. crop acreage, the most direct measure of agricultural demand for fertilizer, was essentially flat during the period in which fertilizer prices tripled and quadrupled. Figure 13 below indexes total U.S. corn and soybean planted acres alongside fertilizer prices to a common 2019 baseline of 100. Total corn and soybean planted acreage ranged from approximately 165.8 million acres to 180.6 million acres between 2019 and 2025, a maximum variation of approximately 9% from the 2019 baseline. Over the same period, anhydrous ammonia prices surged 160% above baseline, urea prices 119%, and DAP prices 90%. If increased demand from additional planted acres were driving higher fertilizer prices, the acreage line and the price lines would move together. They do not: the acreage line is essentially flat while the price lines spike and diverge dramatically, a pattern inconsistent with demand-pull pricing and consistent only with supply-side pricing power.

---

8 The correlation between the U.S. Producer Price Index by Industry for Nitrogenous Fertilizer Manufacturing: Synthetic Ammonia, Nitric Acid, Ammonium Compounds, and Urea compiled by the U.S. Bureau of Labor Statistics, and the Producer Price Index by Commodity: Farm Products: Corn compiled by the BLS is 0.5949 during the Class Period versus 0.4046 prior to the Class Period.

Fig. 14. Total U.S. Corn and Soybean Planted Acres v. Fertilizer Prices (Indexed to 2019 as 100)[9]




171. The economic literature on agricultural input market power confirms this pattern. The American Antitrust Institute ("AAI") has published research finding that fertilizer pricing behavior is more consistent with coordinated oligopoly than with competition and observing that corn growers face a "margin squeeze," paying higher prices to a small group of powerful input suppliers while selling into commodity markets where prices fluctuate independently. Because Midwestern farmers spent nearly $4 of every $10 of corn production costs on fertilizer in 2021, the ability-to-pay pricing mechanism transferred a massive and disproportionate share of farmers' commodity price gains directly to Defendants' bottom lines.

172. Statements by Defendants' executives on earnings calls corroborate their common scheme to extract as much as possible from farmers. In Q1 2021, Mosaic's CEO publicly acknowledged that "price increases for the integrated producers have largely outpaced production

9 USDA NASS Acreage Reports (corn and soybean planted acres); USDA AMS Illinois Production Cost Report (fertilizer prices).

cost increases" and that "grower demand for fertilizer is relatively price inelastic[.]" CF Industries' CEO admitted that market conditions created "a very good platform for a very healthy floor level, probably higher than what people are anticipating," and that the floors "will be positive" for large producers such as CF Industries and the other Defendants.

173. On a Q2 2021 earnings call, asked about desired potash pricing going forward, Nutrien's CEO Schmidt responded: "[W]e are enjoying some prices and we want to continue to enjoy these prices and that's how we are going to think about servicing our growers, to keep them in the game and price accordingly." He thereby calibrated fertilizer prices to farmers' capacity to absorb increases rather than to Nutrien's own production costs.

174. On a Q3 2021 earnings call, Mosaic's CEO said that the market's combination of high demand and low supply meant "further upside in realized pricing for phosphates and potash[]" and "implies higher earnings in the fourth quarter and . . . very strong results continuing into 2022." On CF Industries' Q3 2021 call, its CEO similarly celebrated the "favorable supply-demand dynamics" for large fertilizer producers and a "very, very healthy dynamic that leads to a much longer period of positive fundamentals for our business[]" if it continued "into 2023 and probably beyond." He added that farmers facing rising input costs would not cut back on fertilizer: "if you're a farmer, you can look at different options. But that's not going to come at the expense of nitrogen and probably even at fertilizer. It's going to come at some other issues."

175. On a Q4 2022 earnings call, CF Industries' CEO said, "[l]ooking ahead, we believe that the global nitrogen supply-demand balance and global energy cost structure will continue to present attractive margin opportunities for our cost-advantaged network."

176. On a Q2 2024 earnings call, CF Industries stated that it believed North American nitrogen channel inventories for all products were below average following strong urea and UAN

demand that spring and higher-than-expected planted corn acres. It noted that UAN and ammonia fill programs "achieved prices above 2023 levels despite softening farm economics" caused by falling corn and soybean prices. CF Industries thus acknowledged that fill program prices rose above prior-year levels even as farmer purchasing power declined. In a competitive market, prices fall when buyer purchasing power decreases. CF Industries' prices went up.

177. Taken together, these statements corroborate Defendants' collective ability-to-pay pricing strategy, premised on the shared understanding that farmers have no viable alternative but to accept the prices Defendants set.

#### f. The Financial Proof: Defendants' Own Financial Statements

178. The most compelling proof that cost factors cannot explain Class Period pricing appears in Defendants' own financial statements. In a competitive commodity market, producers facing rising input costs can at best pass those increases on to customers on a roughly one-to-one basis, allowing revenues to rise proportionally while margins remain stable; more often they cannot fully pass through higher costs without risking the loss of customers to lower-priced rivals, so they absorb part of the increase and margins compress. Margin expansion, profits growing substantially faster than costs, is not a competitive outcome. It is the economic signature of pricing power exercised above competitive levels.

179. As Figure 15 demonstrates, the gross margins of Nutrien, CF Industries, and Mosaic expanded dramatically and simultaneously beginning in 2021.[10]

[10] As noted above, Koch and Yara do not make their financials public.

Fig. 15. Defendants' Gross Margins, 2019–2025




180. Figure 15 makes the financial anatomy of the conspiracy unmistakable. In the pre-conspiracy baseline period of 2019 and 2020, all three Defendants operated with gross margins typical of competitive commodity producers: CF Industries averaged approximately 22%, Nutrien approximately 26%, and Mosaic approximately 11%.[11]

181. Beginning in 2021 and peaking in 2022, these Defendants' gross margins expanded dramatically and simultaneously. CF Industries' gross margin surged from 19% in 2020 to 37% in 2021 and then to 52% in 2022, nearly tripling its pre-conspiracy baseline of 22%. Nutrien's rose from 25% in 2020 to 34% in 2021 and 41% in 2022, a 64% expansion from its pre-conspiracy average. Mosaic's climbed from 12% in 2020 to 26% in 2021 and 30% in 2022, nearly tripling its

[11] Mosaic's lower gross margin relative to CF Industries and Nutrien reflects structural differences in product economics, not competitive performance. Nitrogen production (CF Industries' core business) synthesizes natural gas and air—inputs with relatively low variable costs—yielding inherently higher margins. Phosphate and potash production (Mosaic's core business) requires mining phosphate rock, purchasing sulfuric acid and ammonia as feedstocks, and incurring Saskatchewan mining costs—physical commodity inputs whose prices rise with broader market conditions, structurally compressing margins.

pre-conspiracy average of 11%. These three Defendants operate in different nutrient categories, nitrogen for CF Industries, phosphate and potash for Mosaic, and all three for Nutrien, with different feedstock inputs and cost structures. That they expanded margins simultaneously and to similar degrees is powerful evidence of coordinated pricing, not independent competitive responses to separate cost shocks.

182. The post-peak period from 2023 through 2025 further corroborates the conspiracy. After 2022, gross margins moderated but did not return to pre-conspiracy baselines. By 2024, CF Industries' gross margin remained at approximately 35%, still 59% above its 2019 and 2020 average of 22%. Nutrien remained at approximately 29%, still 12% above its pre-conspiracy average of 26%. Mosaic stabilized at approximately 14%, modestly above its pre-conspiracy average of 11%. Then in 2025, margins resumed expanding across all three Defendants, with CF Industries at approximately 38%, Nutrien at approximately 31%, and Mosaic at approximately 16%, consistent with the 2025 price resurgence and with Plaintiffs' allegation that the conspiracy remains ongoing. The failure of margins to return to competitive levels, despite the near-complete normalization of natural gas costs and supply chain conditions by 2023 and 2024, is economically inexplicable absent the persistent structural pricing power maintained through the coordinated conduct alleged herein.

183. In a competitive market, margin expansion by one producer would attract supply expansion by competitors seeking share, which would compress margins back toward competitive levels. That discipline never materialized here. All three of these Defendants expanded margins simultaneously, sustained them through 2022, and then allowed them to contract only partially and gradually, moving in lockstep on the way up and on the way down. No Defendant was willing to

cut price to capture share at historically profitable margins, precisely the behavior a coordinated agreement predicts.

184. Another way to separate legitimate cost pass-through from supracompetitive pricing is to compare how quickly a company's costs rise with how quickly its profits rise. When a firm is merely covering higher input costs, profit growth should roughly mirror cost growth, a ratio close to 1:1, because rivals would undercut prices raised well beyond cost increases and capture share. Ratios substantially above 1:1 signal a breakdown of competitive constraints: a ratio of 5:1 or 10:1 means the firm captures $5 or $10 of additional profit for every $1 of additional cost, an outcome possible only when competitors are not effectively challenging its pricing.

185. Figure 15 applies that diagnostic test, comparing year-over-year changes in cost of goods sold to changes in operating income for Nutrien, Mosaic, and CF Industries across two consecutive periods, 2020 to 2021 and 2021 to 2022. Operating income is the appropriate measure because it reflects core fertilizer profitability, excluding non-operating items such as interest expense, foreign currency effects, impairment charges, and taxes that vary for reasons unrelated to fertilizer pricing.

Fig. 15. The Cost-Price Disconnect: % Change in COGS v. % Change in Operating Income, by Defendant (2020 to 2021 and 2021 to 2022)




186. The results are striking. Measured against the pre-conspiracy year 2020, the 2020 to 2021 period reveals the most dramatic disconnect. Nutrien's costs rose 17% while its operating income surged 593%, a ratio of 35.3:1, meaning Nutrien captured $35 of additional operating profit for every $1 of additional cost, and Nutrien's own executives publicly described the company's strategy during this period as "price over supply." Mosaic's costs rose 20% while its operating income surged 498%, a ratio of 24.6:1, in phosphate and potash segments whose feedstock inputs differ entirely from Nutrien's nitrogen and potash operations, yet the pattern of radical margin expansion was the same. CF Industries' costs rose 25% while its operating income rose 178%, a ratio of 7.1:1; its cost increase was the largest of the three Defendants in percentage terms, and even so it grew operating profits at seven times the rate of its cost increases. On August 5, 2024, when natural gas prices were at historic lows, CF Industries' CEO Anthony Will said, "Longer term, we expect the global energy cost structure to continue to provide significant margin opportunities for our North American production network[.]"

187. Building on already supracompetitive pricing levels, the pattern persisted from 2021 to 2022. CF Industries' cost of goods sold rose 28% while its operating income rose 212%, a ratio of 7.5:1. Nutrien's cost of goods sold rose 23% while its operating income rose 142%, a ratio of 6.2:1. Mosaic's cost of goods sold rose 46%, the steepest cost increase of any Defendant in either period, while its operating income rose 94%, a ratio of 2.0:1. That all three of these Defendants maintained ratios well above the 1:1 competitive benchmark from 2021 to 2022, a period when Defendants publicly attributed the price increases to cost pressures from the Russia-Ukraine conflict, confirms that the increases went far beyond what cost pass-through required.

188. Across all six company-year observations, every ratio exceeded 2:1 and the average ratio was approximately 13.8:1, meaning these Defendants' operating income grew nearly 14 times faster than their costs throughout 2021 and 2022. No plausible cost-based explanation, whether natural gas prices, supply chain disruptions, or geopolitical shocks, accounts for operating profits rising 14 times faster than costs across three companies operating in three nutrient categories with distinct production processes, feedstock inputs, and geographic exposures. If the price increases were independent responses to separate cost shocks, the ratios would vary widely, and some would approach 1:1. Instead, every ratio is extreme and the pattern is uniform, a clear financial signature of coordinated supracompetitive pricing.

**E. Defendants Coordinated Supply Curtailments and Capacity Reductions**

189. Defendants did far more than raise prices in parallel. Throughout the Class Period, each Defendant engaged in a sustained pattern of supply restriction: curtailing production, idling plants, deliberately underutilizing existing capacity, and refusing to restore idled facilities, all while fertilizer demand was strong and margins reached historic highs. Read together with Defendants' public statements, that conduct forms a coherent and mutually reinforcing strategy: suppress supply to sustain supracompetitive prices. Defendants claim that the high prices they

charged resulted from input prices and international supply disruptions beyond their control, but those explanations were excuses or manufactured events used to hide their coordination.

190. On a Q4 2021 earnings call, CF Industries' CEO expressed confidence that the extraordinary price environment would persist for years and dismissed any competitive threat that might compress North American producers' margins, stating that he was "not afraid of this boogie man out there that's going to come and dump excess product into the global marketplace," and projecting that North American producers would enjoy "three or four years of these huge margin opportunities."

191. Defendants knew they had a multi-year window of historically unprecedented energy spreads, yet they chose not to expand production capacity to serve purchasers at competitive prices, directing record cash flows instead toward share buybacks and export-oriented joint ventures while domestic supply remained constrained and prices stayed inflated through 2025.

192. Analysts and Defendants' executives alike described the strategy in plain terms. After Nutrien announced in 2023 that it would slow potash production below capacity, an analyst from Raymond James called the strategy "implied supply discipline." On a Q2 2023 earnings call, Nutrien's CEO framed the simultaneous pause of potash and ammonia production expansion as a "commitment to disciplined capital allocation." And on a Q3 2024 earnings call, CF Industries confirmed that domestic "supply and inventories, whether that be with retailers or with producers, is limited[]" and that "sets up a positive environment" for North American producers.

193. Defendants' thinly veiled supply restrictions did not go unnoticed. On December 8, 2021, the Family Farm Alliance sent a letter to the DOJ "calling for an investigation into the

highly consolidated fertilizer sector on the suspicion of anticompetitive practices." The letter challenged Defendants' unsupported claims of supply shortages:

> Claiming a global shortage, fertilizer companies have recently broken records with the ballooning prices they charge for fertilizer. Yet the companies' own documents refute any shortage claims and reveal they have additional capacity they're not utilizing. While it's true that natural gas prices are currently high, Yara's 2021 third quarter report states explicitly that this has had "[l]imited impact on finished fertilizer production to date; Yara is closely monitoring the situation going forward." Nutrien's annual report states that "due to historically low global ammonia prices we curtailed production . . . while maintaining flexibility to respond to improvements in the market condition." Their potash capacity likewise exceeds current production levels, and in 2020 the cash cost to produce potash was "$59 per tonne, the lowest level on record for Nutrien."

194. At the Senate Agriculture Committee hearing held on May 12, 2026, concerning high fertilizer prices, President of the South Dakota Growers Association Trent Kubik testified that Defendants are not increasing production as they would in a truly competitive environment: "A resulting rise in margins for U.S. manufacturers should, in theory, encourage expansion of production and higher capacity utilization for the industry. Instead, market power has allowed manufacturers to maintain higher prices while also limiting efforts to use existing manufacturing capacity, at the expense of U.S. farmers."

195. In a competitive market, Defendants' extraordinary 2021 and 2022 margins would have triggered aggressive output expansion and investment. Every Defendant moved in the opposite direction, reducing production, deferring investment, or operating below capacity, during the same period and under the same market conditions. That uniformity is economically irrational as independent behavior and is consistent only with a coordinated understanding that no producer would relieve the supply tightness on which the conspiracy depended.

196. Defendants also blocked the imports that would otherwise have disciplined domestic prices. According to the Agricultural Retailers Association, the American Soybean

Association, and the National Association of Wheat Growers, Defendants not only restricted production but kept prices from equalizing through imports by effectively shutting the largest foreign exporters out of the most concentrated parts of the domestic industry. Those organizations report that Defendants, including CF Industries and Mosaic, gained significant domestic market share in 2020 by unloading large volumes of fertilizer at low prices, a position that enabled Defendants to control the price of fertilizer in the United States during the Class Period through their coordinated production restraint.

197. The following supply restriction actions occurred across all five Defendant families during the Class Period, under the same market conditions of record demand and record margins:

a. On its Q1 2021 earnings call, Nutrien disclosed that its stated strategy was explicitly "price over supply," a public declaration that Nutrien would manage production to maximize price rather than to serve farmer demand.

b. On a Q1 2021 earnings call, Mosaic refused to restart idled potash production capacity at its Colonsay facility despite admitting that demand for potash was strong, explaining that a restart "will also require a sustained price, probably a little higher than what it is even today."

c. On a Q2 2021 call, Nutrien disclosed that it was "sold out for a period of time" in potash while "continuing to look at the strong prices," and projected that new supply would remain "relatively limited . . . [for] the next couple of years."

d. In September 2021, CF Industries shut down its two U.K. nitrogen and ammonia production facilities, which the President of the U.K.'s National Farmers Union stated was "likely to further restrict global supply."

e. In its Q4 2021 earnings disclosure, Yara reported that it had reduced European ammonia production to approximately 65% of capacity and would "continue to optimize its operating rates" in 2022; language that, like Nutrien's "price over supply" declaration, signals deliberate market management. Yara's CEO Svein Tore Holsether publicly described the operating rate reductions as "a responsible response to current market conditions."

f. In June 2022, CF Industries closed its Ince facility in the United Kingdom.

g. On a Q2 2022 earnings call, CF Industries admitted that it had deliberately limited its domestic UAN fill program as a strategic choice to prioritize exports.

h. On its Q2 2022 earnings call, Nutrien stated that it had been exporting more UAN from the United States than it previously had and was pursuing opportunities to export more ammonia.

i. In June 2022, Yara took its nitrogen ammonia plant at Belle Plaine, Saskatchewan, one of its principal North American nitrogen production facilities, offline "for a turnaround," during the summer fill pricing window when growers were seeking fertilizer inventory. Yara operated at 57% of production capacity in Q3 2022, down from its more typical rate of 80% to 90%. The curtailments removed 1.7 million tonnes of Yara's ammonia capacity and 900,000 tonnes of its finished fertilizer production capacity from the market.

j. In December 2022, Mosaic announced a production curtailment at Colonsay, after walking back its claim earlier in the year that it was "ramping up . . . to a targeted 1.8mn–2mn t/year by late 2023."

k. In 2023, Mosaic admitted that its "ability to produce processed phosphates has been less than our annual operational capacity."

l. In February 2023, Yara International's CEO stated that Yara had opted for "proactive curtailment to optimally manage market conditions" in 2022 and confirmed that Yara had cut ammonia output by 1.7 million metric tons, 35% of European capacity.

m. In May 2023, Yara shut down its Ferrara, Italy, ammonia plant just three weeks after bringing it back online.

n. In August 2023, Nutrien announced that it would "indefinitely pause its ramp-up plans for potash production and halt work on its clean ammonia project at Geismar, Louisiana."

o. In 2023, CF Industries ceased operations at the Billingham ammonia facility, the largest ammonia complex in the United Kingdom. The permanent closure eliminated approximately 590,000 short tons of annual ammonia capacity, a substantial portion of which had previously been exported to supply the U.S. market.

p. In its 2024 Annual Information Form, Nutrien acknowledged that its potash nameplate capacity represented 53% of total North American nameplate capacity and that its production represented 57% of North American production.

q. In April 2026, Mosaic announced that it would shutter two Brazilian phosphate plants. USDA Deputy Secretary Stephen Vaden commented that "[y]ou take a million tons of supply out of the international market, that affects the price worldwide" and "[i]t will only lead to one thing—higher prices."

198. Defendants not only pulled back production at their existing facilities; they also failed to take meaningful steps to expand capacity and arrested expansion already underway, despite strong demand and record profits. No publicly available information shows concerted efforts by Defendants to expand production at existing facilities or to open new ones.

### F. Government Investigations

199. Defendants' anticompetitive conduct has drawn sustained federal attention.

200. In September 2025, the DOJ and the USDA signed a Memorandum of Understanding formalizing cooperation on competition issues across agricultural input markets, including fertilizers. The memorandum committed the agencies to "protecting American farmers from the burdens imposed by high and volatile input costs[.]" That interagency coordination reflects the federal government's growing concern about structural competition failures in the fertilizer industry.

201. In 2025, the DOJ launched a formal investigation into fertilizer industry pricing and supply practices. The investigation reportedly targets CF Industries, Nutrien, Mosaic, Koch, and Yara for possible civil and criminal antitrust violations.

202. In December 2025, President Trump signed an executive order directing the DOJ and the FTC each to establish a "Food Supply Chain Security Task Force" with authority to aggressively investigate price fixing and anticompetitive practices across the food sector, explicitly including fertilizer manufacturers.

203. Congressional concern has mirrored executive branch action. Senator Chuck Grassley of Iowa reintroduced the Fertilizer Research Act, a bipartisan measure requiring the USDA to study pricing and competition across the fertilizer market. On October 28, 2025, the Senate Judiciary Committee held a hearing entitled "Pressure Cooker: Competition Issues in the Seed and Fertilizer Industries," at which farmers testified about the devastating effects of fertilizer pricing and market concentration, and senators from both parties expressed concern and signaled legislative action. U.S. Secretary of Agriculture Brooke Rollins confirmed that the USDA study would proceed in coordination with the DOJ investigation, "to take a look at whether farmers truly have fair choices when buying the inputs that feed the nation."

204. At that hearing, Mark Mueller, President of the Iowa Corn Growers Association ("ICGA"), testified that fertilizer costs are crushing corn growers in Iowa and across the country, forcing growers to choose between buying fertilizer and staying solvent, and he attributed those costs to two decades of unchecked consolidation that left only a few major companies controlling each segment of the U.S. fertilizer industry. Dr. Diana Moss, Vice President and Director of Competition Policy at the Progressive Policy Institute, testified that fertilizer price changes over the last 25 years are not accounted for by changes in demand for crop commodities or by changes in input costs such as the natural gas needed to produce nitrogen, and that "price patterns marked by an unexplainable price spike, followed by a price decrease, then another price spike, may well indicate anticompetitive coordination." Dr. Moss further testified that such dynamics may reflect the formation of a tacit or explicit agreement among producers, its breakdown through defection, and its reconstitution, and that analysis of collusive behavior would consider the possibility of regional cartels or a global "super" cartel among fertilizer producers, or the more complex

interaction between private companies, government sanctioned export cartels, and governments themselves.

205. In January 2026, USDA Deputy Secretary Stephen Vaden publicly stated that Nutrien and Mosaic "collude" to limit U.S. fertilizer supply and control prices and described their combined market position as a "duopoly" that "constrained fertilizer supply in this country" and "drove up the cost that farmers are paying." Deputy Secretary Vaden added that the administration would not allow these companies to undermine new market entrants or continue their anticompetitive conduct and promised to "break up the cute little game that Mosaic and Nutrien have been playing for the last several years." He repeated the point in March 2026, reiterating that Nutrien and Mosaic were engaging in "duopoly" behavior.

206. In February 2026, the ICGA and the Texas Corn Producers Association each sent letters to then-U.S. Attorney General Pam Bondi seeking information about what the DOJ is doing to pursue possible antitrust actions against the fertilizer industry. As Bloomberg Green Markets reported, the letters reflected farmers' growing frustration over lower crop returns while fertilizer prices remain "artificially inflated."

207. On March 4, 2026, news outlets reported that the DOJ Antitrust Division's Chicago Office had launched a formal investigation into whether major fertilizer producers colluded or coordinated to raise the prices charged to U.S. farmers. The investigation reportedly targets the Defendants in this action: Nutrien, CF Industries, Mosaic, Koch, and Yara.

208. On March 12, 2026, U.S. Senator Josh Hawley sent letters to the CEOs of CF Industries, Mosaic, Koch, Nutrien, and Yara. Senator Hawley wrote that although the Iranian conflict had recently disrupted the global fertilizer market, including bottlenecks in the Strait of Hormuz, the price run-ups American farmers face far outpace any disruption from those events,

and the share of U.S. fertilizer supply affected by the Strait appears minimal compared with the sudden change in prices. He wrote that "[t]hese latest price hikes are especially troubling because the fertilizer industry is highly concentrated," noted public reporting that a small group of firms dominates the domestic market for nitrogen, phosphate, and potash and that the DOJ has been investigating whether leading fertilizer producers coordinated to raise prices, and warned that record retail nitrogen pricing could cripple American corn production after the historic run-ups of 2021 and 2022, and that Congress would not ignore a company using the overseas conflict as a "pretext to raise prices beyond what market conditions justify[.]"

209. Senator Hawley sent a further letter to then-Attorney General Bondi urging the DOJ to formally investigate recent increases in fertilizer prices, following reports of recent Departmental action. He noted the USDA's finding that in 2021 fertilizer prices paid by U.S. farmers increased more than 60% overall, including a 95% increase in nitrogen fertilizer prices and more than a 70% increase in potash prices, and urged that if firms are using a foreign crisis as cover to impose unjustified price increases, restrict supply, or coordinate market behavior, the DOJ should act swiftly.

210. On March 20, 2026, a bipartisan group of senators introduced the Fertilizer Transparency Act of 2026, which would mandate weekly public reporting of fertilizer prices, production volumes, and sales volumes. The sponsors introduced the bill because "rising fertilizer costs and low commodity prices are continuing to erode farmers' profitability."

211. On April 11, 2026, President Trump posted the following on Truth Social: "The United States will not accept PRICE GOUGING from the fertilizer monopoly! American farmers, we have your back!"

212. The May 12, 2026 hearing of the U.S. Senate Agriculture Committee was titled "Perspectives on the Fertilizer Industry: Ensuring a Stable and Affordable Supply for American Producers." The high cost of fertilizer products sold in the United States was the central issue, and the testimony showed how Defendants' consolidation and practices produced those prices. Senator Amy Klobuchar opened the hearing by explaining that stubbornly high fertilizer prices have been an issue for years in a market with a handful of domestic suppliers and little transparency into pricing, and that four producers control 77% of NPK fertilizer sales in the United States. The first witness, Trent Kubik, President of the South Dakota Growers Association, testified that the price increase farmers presently face is not the same as those that occurred before, because the 2020 price increase did not track an increase in natural gas prices, and that the difference is explained by undue concentration levels and associated anticompetitive exclusionary practices, which highlights the need for increased market transparency and antitrust enforcement. Mr. Kubik further testified that "the market power of fertilizer companies gives them the ability to control the price we pay and restrict supply when it suits their financial needs and without regard to competitive pressure."

213. Other witnesses and members testified to the same effect. Andy Green, Principal and Senior Advisor for Center Market Strategies and former Senior Advisor for Fair and Competitive Markets at the USDA, testified that fertilizer markets' tendency toward anticompetitive behavior is not a new problem, that competition concerns were heightened before the most recent war, and that the current pricing trend is so pronounced as to raise significant questions whether prices reflect the exercise of fertilizer companies' market power rather than the supply of, and demand for, fertilizer and the costs of inputs; pointing to the supranormal profits

Defendants earned over the past several years, he testified that antitrust enforcers should revisit the mergers and the other conduct and bring enforcement cases.

214. Eddie Melton, President of the Kentucky Farm Bureau, asked the President and Congress for improved research into fertilizer pricing, testifying that opaque pricing and limited options leave producers unable to respond effectively, that 2026 marks the fourth year of decline driven by persistently low commodity prices and elevated fertilizer costs, that 26 farms had filed for Chapter 12 bankruptcy in the first quarter of 2026, and that weakening domestic food production capacity and increasing reliance on foreign supply chains pose a risk to national security; asked by Senator Peter Welch what farmers need, he answered that all farmers ask for is to purchase their inputs in a competitive market.

215. Senator Roger Marshall observed that fertilizer costs now amount to 40% of American farmers' total input costs and that American farmers are paying monopoly prices for inputs with no pricing power. Senator Tina Smith stated that fertilizer companies raise their prices because they can, and that is the market power they have; citing the Institute for Agriculture and Trade Policy in Minnesota, she stated that the nine largest fertilizer companies made an estimated $84 billion in profits in 2021 and 2022 and that in 2022 major fertilizer companies such as Mosaic and Nutrien saw profits increase by 100% to 200%, and Mr. Kubik responded that farmer profits had not risen at the same rate and that farmers feel taken advantage of because fertilizer companies can disregard their own cost of production and simply set a price. Senator Welch stated that American agriculture is in a crisis because an immense amount of wealth is being created by farmers who are not receiving it, and that farmers whose input costs march upward step by step as the price of corn or oats rises are at the mercy of a consolidated market.

216. On May 28, 2026, the FTC announced that it had opened a "major industrywide investigation into the precipitous rise of fertilizer prices in this country." FTC Chairman Andrew Ferguson, who made the announcement, said that "USDA data has shown the single largest increase in input costs of farmers across the United States since 2020 has come from fertilizer" and that "these continued price increases are not something our nation, much less our farmers, can continue to ignore." Chairman Ferguson appeared on Fox News the same day and said that "where there are very few manufacturers it's often good evidence that there's very poor competition," that "farmers deserve the benefit of a free market and free competition, and if they're not getting it, then the FTC needs to fix it," and "antitrust laws were originally written largely at the behest of farmers who were sick of giant trusts preventing them from getting the benefit of competition and that's what we're gonna make sure is not happening again."

217. On August 3, 2026, USDA Deputy Secretary Stephen Vaden announced that the DOJ and FTC investigations into agricultural input manufacturers are concluding, that he "expect[s] there to be announcements coming forward in due time that will show that there's some 'there there[,]'" and that the federal government will take "formal action."

**G. Plus Factors Supporting the Inference of Unlawful Conspiracy**

218. Under controlling antitrust law, a plaintiff may establish a Section 1 conspiracy through circumstantial evidence of conscious parallelism augmented by "plus factors," additional facts that, taken together, render an inference of coordinated conduct more plausible than independent action. "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."

219. Recognized plus factors include: (i) market concentration that makes coordination feasible; (ii) conduct against individual self-interest that makes sense only as part of a coordinated

scheme; (iii) opportunities for collusion through trade associations and industry meetings; (iv) high barriers to entry that protect coordination from competitive erosion; (v) inelastic demand that enables sustained supracompetitive pricing; (vi) product interchangeability that facilitates uniform pricing; and (vii) prior antitrust violations reflecting an established culture of anticompetitive conduct. All seven plus factors are present here, as set forth below.

**1. Extreme Market Concentration**

220. Market concentration bears directly on the plausibility of an antitrust conspiracy. The U.S. fertilizer market is among the most concentrated industries in the American economy, which supplies the structural precondition that makes coordinated pricing feasible and effective.

221. A 2024 Texas A&M University study titled "Concentration and Competition in the United States Fertilizer Industry" reported Herfindahl-Hirschman Index ("HHI") values in the United States of 3,455 for potash, 2,382 for nitrogen fertilizer, and 4,553 for phosphate fertilizer. The HHI is calculated by summing the squares of each firm's market share. The DOJ and the FTC treat markets with an HHI value above 1,800 points as highly concentrated.

222. Farmers themselves have recognized that consolidation drives higher prices. A North Dakota farmer recently observed that "[f]ertilizer's up over a year ago, but I think a big part of that is driven by too few players . . . when you have monopolies control fertilizer, that's what happens."

223. In comments submitted to the USDA, U.S. farmers described an asymmetric power dynamic in the fertilizer industry. They reported being held "hostage while we have no other options" and left "at the mercy of the large conglomerates" that could cause "artificial product shortages" through their "ownership of fertilizer resources."

224. That power dynamic follows from extreme concentration. In nitrogen fertilizer, CF Industries, Nutrien, Koch, and Yara account for more than 80% of market share, in a market that

had "46 firms making Nitrogen" in 1984. The United States has only two major potash suppliers, Nutrien and Mosaic, and those two firms likely control a high share of imports as well: 93% to 96% of U.S. potash is imported, and 83% of potash production comes from Canpotex, the Canadian export cartel consisting of Nutrien and Mosaic. The number of phosphate producers fell from 11 phosphoric acid producers with 12 million metric tons of capacity to four U.S. phosphate producers with 7.5 million metric tons of capacity in 2021, and Mosaic controls 60% of that capacity.

**2. Conduct Against Individual Self-Interest**

225. A hallmark plus factor supporting an inference of conspiracy is conduct that would be economically irrational for a single firm acting unilaterally but becomes rational as part of a coordinated scheme. A firm with significant idle capacity facing strong demand and record prices has every individual incentive to maximize output, capturing as much of the profit opportunity as possible before market conditions change. The consistent, industry-wide failure to do so during the Class Period is one of the most powerful plus factors in this record.

226. Parallel curtailment became so commonplace that market analysts came to expect it. On December 9, 2022, an analyst from Scotiabank wrote: "Unless Nutrien sees different data, we think the company would benefit by proportionately matching Mosaic's move, not to mention its shareholders and the industry overall. With Mosaic taking the lead, Nutrien effectively holds a 'free' call option on tightening the potash market into the spring." The analyst framed Nutrien's decision whether to match Mosaic's curtailment as an opportunity and treated parallel curtailment as the expected and rational market response. In a competitive market, it would be neither.

227. Consider Nutrien's conduct. The world's largest potash producer publicly declared its strategy as "price over supply" in Q1 2021; when potash prices were rising sharply, farmer demand was strong, and Nutrien was "sold out," meaning customers could not obtain the potash

they needed. A competitive firm sold out at record prices would immediately announce and execute capacity expansion to capture share. Nutrien instead publicly committed to "relatively limited new supply in the next couple of years," had returned $9 billion to shareholders since 2018, and allocated only $1 billion to capital expenditures in 2022. That posture is economically rational only if Nutrien was confident, based on a coordinated understanding with Mosaic and other competitors, that its rivals would also refrain from supply expansion; unilateral supply restraint would simply cede market share to Mosaic, CF Industries, and Koch.

228. Mosaic's conduct is similarly contrary to unilateral self-interest. At the outset of the Class Period in Q1 2021, Mosaic's CEO publicly acknowledged that "demand for potash has been strong," yet Mosaic refused to restart idled production capacity at its Colonsay potash mine, conditioning any restart on "a sustained price, probably a little higher than what it is even today." A firm acting unilaterally in its own interest, facing strong demand and rising prices, would immediately restore idled capacity to capture the profit opportunity. Mosaic did the opposite: it withheld supply while prices rose and then, in December 2022, after publicly claiming that it was "ramping up" Colonsay "to a targeted 1.8 to 2 million tonnes per year by late 2023," abruptly curtailed production at that same facility.

229. By 2023, Mosaic admitted that its "ability to produce processed phosphates has been less than our annual operational capacity," while simultaneously reducing capital expenditures by $200 million for 2024 and returning nearly $900 million to shareholders year to date. On a Q1 2023 earnings call, Mosaic's CEO stated that he would not restore idled production capacity because doing so would "destroy the market," i.e., reduce prices. Mosaic's CEO confirmed the governing strategy again as late as Q3 2024, stating that "until we see something change on the supply side fundamentally, that is going to stay," and expressing no concern about

"an obvious catalyst for something to change on the pricing side." That is not the language of a firm competing for market share; it is the language of a firm confident that supply discipline will hold. Withholding capacity during strong demand, curtailing announced ramp-ups, cutting capital investment while returning cash to shareholders at record margins, and publicly projecting that prices will remain elevated because no new supply is coming is economically irrational for a firm acting unilaterally, but entirely rational for a firm operating under a coordinated understanding with Nutrien that neither producer would relieve the supply tightness on which the conspiracy's pricing power depended.

230. Yara's conduct was similar. Despite reporting that its 2021 United States EBITDA was 76% higher than the prior year—"mainly reflecting higher production margins in North America"—Yara simultaneously curtailed ammonia and fertilizer production. Its ammonia output fell from 7,606 thousand tonnes in 2020 to 7,261 thousand tonnes in 2021, and its finished fertilizer production fell from 21,047 thousand tonnes to 20,856 thousand tonnes over the same period.

231. CF Industries' conduct reflects the same pattern. Despite achieving record EBITDA of $5.88 billion in 2022 and publicly acknowledging "all-time record" global nitrogen demand, CF Industries announced no new U.S. greenfield nitrogen production capacity during the Class Period. It instead permanently closed its Billingham ammonia plant in the United Kingdom and directed $5 billion to shareholder returns rather than to supply investment. A competitive firm that was earning record margins in a market with acknowledged strong demand would invest aggressively in capacity expansion. CF Industries did not, behavior that is, again, irrational unilaterally but rational as part of a coordinated strategy to avoid the supply growth that would erode pricing power.

232. Figures 17, 18, and 19 below show that Nutrien and Mosaic increased their gross margins significantly during the Class Period without increasing production.[12]

Fig. 17. Nutrien Potash Capacity, Production, and Gross Margin, 2018 to 2025




12 The gross-margin used in Figures 17, 18, and 19 are high-level fertilizer category gross margins so they differ from the company gross margins found in Figure 15.

Fig. 18. Mosaic Potash Capacity, Production, and Gross Margin, 2018 to 2025




Fig. 19. Mosaic Phosphates Capacity, Production, and Gross Margin, 2018 to 2025



### 3. Opportunities for Collusion Through Joint Ventures, Trade Associations, and Industry Meetings

233. Defendants had abundant and repeated opportunities to communicate and coordinate their lock step conspiracy through their shared membership in multiple joint ventures, trade associations, industry conferences, joint investor presentations, and shared market data and pricing intelligence platforms. Shared competitor forums are a recognized plus factor because they supply the structural opportunity for coordination, the means by which a common understanding could be reached and maintained across the five-year Class Period. The record here goes well beyond shared membership: during the height of the alleged conspiracy, Defendants' own CEOs simultaneously held positions of formal leadership authority in the same trade association, a direct institutional channel for interaction at the very highest level of each competing firm.

#### a. Canpotex

234. As set forth above, Defendant Canpotex is a Canadian potash export and marketing company jointly owned by Defendants Nutrien and Mosaic, formed in 1972 as a joint export association for Canadian potash producers, through which its owners collectively market, sell, distribute, and transport potash produced from their Canadian mines to customers outside North America. Canpotex's five largest markets, Brazil, China, India, Indonesia, and Malaysia, account for approximately 75% of its annual potash exports. Its integrated export system of specialized railcars, port terminal facilities, and dedicated ocean vessels allows its members to move potash from Saskatchewan mines to overseas customers through a single centralized transportation network.

235. In August 2022, Nutrien announced that its Board of Directors had appointed Ken Seitz as President and CEO. Seitz was the former President and CEO of Canpotex. Employees

rotate regularly among Nutrien, Mosaic, and Canpotex. Canpotex President and CEO Gordon McKenzie is the former Mosaic VP of Global Sales, and Canpotex SVP of Operations Vinesh Kohli is the former Nutrien Senior Director of Transportation and Distribution Commercial. The Canpotex Board of Directors includes Chris Reynolds (Nutrien EVP), Todd Denzin (Nutrien VP, Commercial), Corrine Richard (Mosaic SVP), and Jenny Wang (Mosaic SVP of Global Strategic Marketing).

236. By selling potash through a single export marketing organization, Canpotex gives its owners a mechanism for coordinating key aspects of potash sales, including export volumes and shipping schedules, and it collects and manages competitively sensitive information concerning potash production, inventories, customer demand, pricing conditions, and shipment logistics. Canpotex is not used to export potash into the United States, but it creates opportunities for would-be competitors Nutrien and Mosaic to exchange that information and align their pricing and supply strategies in this country.

237. Canpotex's supply management conduct during the Class Period further confirms its role as a coordinating mechanism for Nutrien and Mosaic. In July 2024, Canpotex publicly announced that all potash volumes available for offshore sale through September 30, 2024, were fully contracted, citing "strong demand and engagement in all major offshore markets." In March 2025, Canpotex again confirmed that it was fully committed on its offshore sales volumes for the entire first half of 2025.

238. Those announcements, made during periods of elevated domestic U.S. potash prices, are consistent with Nutrien and Mosaic using Canpotex to manage the timing and volume of global potash supply in a manner that supports domestic price levels. By committing offshore volumes forward and publicly signaling supply constraints in international markets, Canpotex

gives them a joint mechanism to manage global potash availability in ways that reinforce the domestic supply discipline documented herein.

239. In a 2010 article, the *New York Times* described Canpotex "as a legalized cartel for controlling potash prices." The article explained that "[r]ather than trade its product through open markets, Canpotex negotiates long-term, often secret, pricing agreements with customers," and that Canpotex and its members "often throttle back production to restrict supply" when "faced with demands for lower prices." Murray E. Fulton, an agricultural economist at the University of Saskatchewan, said that Canpotex is the "price-setter" and that its contract agreements largely determined what the world paid for potash.

240. Indeed, "Professor Fulton and many others argue that [Canpotex's] cooperative pricing approach informally carries over into sales to the United States, the largest market for the Canadian mines."

241. "While there is no formal cartel for sales to the United States, there is no question that the discussions these companies have because of Canpotex have a significant impact on the U.S. market," Professor Fulton said. "Those discussions allow them to understand what each other is doing."

242. On a Q1 2022 earnings call, Nutrien said: "With respect to our margins compared to what Mosaic might have said on their call . . . I think it's fair to say that out of Canpotex, you can expect something similar. And then in North America, we would go our own way. And so, . . . I wouldn't talk about that because that's confidential. But yes, I think generally . . . you can say that it would be similar." In a genuinely competitive market, a producer would have no basis to predict that a rival's margins would be "similar" to its own, and no reason to treat that similarity

as confidential, unless the two had reached a common understanding about the prices they intended to charge and the supply volumes they intended to withhold from the North American market.

243. In May 2023, Mosaic's CEO spoke directly on behalf of Canpotex, demonstrating that Mosaic has direct visibility into Canpotex's pricing strategy.

244. On January 21, 2026, USDA Deputy Secretary Stephen Vaden held a videotaped conversation with the National Agricultural Law Center in which he attributed high fertilizer prices to anticompetitive conduct, including the Canpotex arrangement, telling the audience:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay. It's unacceptable.

**b. Point Lisas Nitrogen Limited**

245. Defendants CF Industries Holdings, Inc., and Koch Fertilizer, LLC, jointly own and operate Point Lisas Nitrogen Limited ("PLNL"), a large-scale ammonia production facility in Trinidad and Tobago. PLNL is a 50/50 joint venture that produces hundreds of thousands of tons of anhydrous ammonia annually, an essential upstream input for the nitrogen fertilizers, including urea and UAN, sold into the United States. Because ammonia is the foundational feedstock for downstream nitrogen products, control over ammonia production and allocation directly affects supply conditions, costs, and pricing in U.S. nitrogen fertilizer markets.

246. Through their joint ownership and operation of PLNL, CF Industries and Koch necessarily coordinate on production levels, plant operations, maintenance schedules, capital expenditures, and the disposition of output. Those joint activities bring two otherwise competing nitrogen producers into repeated, high-level contact concerning a critical upstream input, and they provide recurring opportunities to exchange competitively sensitive information, including present

and anticipated production volumes, inventory positions, shipping plans, and demand expectations. In a concentrated commodity market, a shared production platform of this kind lowers the costs of coordination, increases each producer's transparency into the other's operations, and makes it easier to reach and maintain a common understanding about output discipline. Consistent with those economic incentives, Defendants used PLNL as a mechanism to align production and supply decisions that had foreseeable and intended effects on prices in U.S. nitrogen fertilizer markets.

247. PLNL's ammonia output is export-oriented and can be directed into global markets, but it ships primarily to the United States, with regular deliveries to ports in Florida, California, Texas, and Louisiana. Output can also be withheld based on the joint venture's operational decisions. By coordinating capacity utilization, turnaround timing, and output allocation at PLNL, CF Industries and Koch can influence the volume of ammonia, and by extension of downstream nitrogen products, available to the U.S. market, and coordinated reductions or delays in PLNL output, or aligned decisions about the timing and destination of shipments, can tighten supply conditions and support higher prices for ammonia, urea, and UAN sold domestically.

### c. The Fertilizer Institute (TFI): Board Leadership, Annual Meeting, and Industry Conferences

248. The Fertilizer Institute ("TFI"), founded in 1969 and headquartered in Arlington, Virginia, is the primary domestic trade association and federal lobbying organization for the U.S. fertilizer industry. TFI represents fertilizer producers, wholesalers, retailers, and trading firms before Congress and federal regulatory agencies, and its member services expressly include "market intelligence data collection and aggregation." All five Defendants are active TFI members, as set forth below.

249. TFI Board Leadership. In February 2019, Tony Will, President and CEO of CF Industries, was elected Chairman of the TFI Board of Directors, a position he held through the 2021 board election, presiding over board meetings attended by competing fertilizer producers, including other Defendants. In 2021, at the peak of the price coordination period, TFI held its Annual Meeting in Dallas, Texas, where Will was reconfirmed as TFI Chairman and Koch Fertilizer's Scott McGinn was elected Vice Chairman. That April 30, 2021 board election occurred while fertilizer prices were in the middle of their most rapid escalation, the same Q1 2021 period in which Nutrien publicly declared "price over supply" and Mosaic and CF Industries announced parallel supply discipline. Senior representatives of every Defendant were simultaneously elected as TFI board directors: Tony Will (CF Industries, Inc.), Scott McGinn (Koch Fertilizer, LLC), Michael Webb (Nutrien), Joc O'Rourke (The Mosaic Company), and Geraldo Mattioli (Yara). All five of Defendants' senior officers, therefore, sat together on TFI's Board of Directors during the height of the alleged conspiracy.

250. TFI Annual Business Conference. TFI's Annual Business Conference is, by TFI's own characterization, "the premier networking event for the fertilizer industry" featuring "three days of meetings, networking and productive business." TFI makes private meeting suites and rooms available to member companies for bilateral meetings during the conference. Discovery will establish the full schedule of meetings Defendants' senior leadership attended; based on publicly available records, senior representatives of at least three of the five Defendants attended each of these conferences.

251. TFI World Fertilizer Conference. TFI also holds an annual World Fertilizer Conference each fall, described as "fall's most important business and networking event for the global fertilizer industry," drawing "hundreds of TFI members, industry professionals, and

representatives from around the world." Recent conference locations include Dallas, Texas, and Chicago, Illinois. Commercial, market intelligence, and senior management staff from fertilizer companies, including Defendants, attend it, and TFI hosts other industry events throughout the year, including the TFI Agronomy Conference and Expo and the TFI Market & Logistics Conference.

252. TFI Market Intelligence Data Collection. TFI publishes "The Fertilizer RECORD," a market data report of monthly data released quarterly that collects and aggregates individual member data on fertilizer production, producer inventories, and "producer disappearance," meaning sales volumes, and then provides that aggregated information back to member companies. TFI also publishes a Fertilizer Capacity Report disclosing "fertilizer production capacity by company by location in Canada and the United States" across all three macronutrients, including the capacity of each of the five Defendants. TFI member companies, including Defendants, supply their own capacity and production data to TFI for inclusion in these reports, which are then made available to all member-competitors.

253. As of 2026, key executives from Nutrien, Mosaic, CF Industries, Koch, and Yara continue to serve on the TFI Board of Directors, and TFI expressly markets to manufacturer members their access to "trusted information and data" and "market intelligence data" as a primary membership benefit. During the Class Period, TFI sponsored more than thirty in-person trade events, creating a sustained and overlapping calendar of opportunities for Defendants' commercial, executive, and technical personnel to interact in settings where supply, demand, and pricing are the primary subjects of discussion. TFI serves as an institutionalized information exchange through which Defendants' competitively sensitive capacity and production data flows to their direct competitors with TFI as the intermediary.

**d. The International Fertilizer Association: Executive Committee and Annual Conference**

254. The International Fertilizer Association ("IFA") is the sole global fertilizer trade association. Founded in 1927 and headquartered in Paris, France, IFA has approximately 500 members from approximately 80 countries. IFA's Board of Directors includes permanent seats allocated to major member organizations, specifically including Nutrien and CF Industries, alongside rotating seats held by other producers.

255. IFA's Executive Committee is a senior governance body responsible for the association's financial oversight and operational coordination. During the Class Period, CF Industries' CEO Tony Will served as IFA Chair from 2023 to 2025. He replaced Svein Tore Holsether, President and CEO of Yara International ASA, who took the post in June 2021. When Will completed that term in May 2025, Nutrien's CEO Kenneth Seitz was elected IFA Chair, and Will remained on the Executive Committee as Immediate Past Chair. Seitz (Nutrien) and Will (CF Industries), the CEOs of two of the three largest nitrogen fertilizer producers in North America, therefore served simultaneously on IFA's Executive Committee, as Chair-elect and Chair and then as Chair and Immediate Past Chair. Senior representatives of the following Defendants currently serve on IFA's board: Chris Bohn (CF Industries, Inc.), Kenneth Seitz (Nutrien), Bruce Bodine (The Mosaic Company), and Svein Tore Holsether (Yara).

256. IFA holds an Annual General Meeting and Conference each spring, the primary global gathering for fertilizer industry executives. IFA Annual Conference locations during the Class Period include Vienna in May 2022, the Czech Republic in May 2023, Singapore in May 2024, and Monaco in May 2025. Defendants' senior representatives attended these conferences, where they presented, voted on governance matters, and interacted with one another in formal and informal settings.

257. IFA participants discussed pricing and held closed-door meetings at the annual conference. At the 2022 Vienna IFA Annual Conference, for example:

a. "Sources said the most likely price for the next [urea] tender, based on rumors and talk during the IFA conference in Vienna, would be around $640/mt CFR."

b. "Sources said they were surprised to hear a more bullish attitude [for quoted prices] during the IFA meeting in Vienna."

c. "Jordan Phosphate Mines Co. (JPMC) and Indonesia's Minister of Agriculture, Syahrul Yasin Limpo, have held talks about the further potential of Jordan supplying Indonesia with phosphate rock and fertilizers. . . . The two parties held the talks at a May 30 meeting on the sidelines of the International Fertilizer Association's annual conference in Vienna."

258. IFASTAT and Market Intelligence. IFA operates IFASTAT, a proprietary statistical database compiled by IFA's Market Intelligence team that provides 15 years of global production, trade, and supply data, consumption data, and detailed market outlook reports. IFA member companies, including Defendants, which hold board seats, receive detailed statistical reports unavailable to non-members. IFA also holds separate thematic committee meetings, including a Sustainability Committee attended by market analysts and commercial staff from member companies, which, conducted between the annual conferences, provide additional forums for the exchange of market intelligence among competing producers.

**e. The Fertilizer Industry Round Table (FIRT) and Other Shared Forums**

259. The Fertilizer Industry Round Table ("FIRT"), now operated in partnership with TFI, holds an annual Fertilizer Outlook and Technology Conference, recently held in Savannah,

Georgia, and publishes proceedings designed to "review best practices and processes across a wide range of fertilizer, agricultural, and environmental topics." That conference provides a further forum for Defendants' technical personnel to interact, share operational information, and discuss supply, demand, and production trends, and FIRT's technical and operational staff-level participation supplements the CEO-level interactions at TFI and IFA, creating a multi-layer network of competitor interactions that spans the TFI chairmanship down to technical and commercial staff. The FIRT Board of Directors has included David Bilby (CF Industries), Shawn McGreevy (Koch Fertilizer, LLC), and Gary Vogen (Yara North America).

260. The BMO Capital Markets Farm to Market Conference. The BMO Capital Markets Farm to Market Conference is an annual two-day event held each spring in New York City, New York, described as featuring "candid and informative discussions and panels with leaders from more than 100 companies in the sector." BMO confirmed that Nutrien, Mosaic, CF Industries, and Yara International all participate regularly as presenters, with Nutrien's CEO Ken Seitz specifically confirmed as a speaker at the 2024 edition and CF Industries confirmed as a participant in 2025. The 2022 conference, held at the height of the Class Period price surge, featured Nutrien's Interim President and CEO Ken Seitz as a speaker. The conference has been held annually for at least 20 years and creates direct interaction opportunities between the CFOs and CEOs of competing fertilizer producers in an intimate setting with approximately 300 investors, a setting in which competitive market intelligence, pricing strategy, and supply outlook are the primary topics of management presentations.

**f. Other Trade Organizations**

261. Fertilizer Canada ("FC"). All Defendants are members of FC, a Canadian fertilizer industry organization headquartered in Ottawa, Ontario, that represents producers, manufacturers, and wholesale and retail distributors of nitrogen, phosphate, potash, and sulfur fertilizers.

Executives from CF Industries, Inc., Koch Fertilizer Canada, Mosaic, Nutrien, and Yara North America, Inc., sit on FC's Board. In August 2023, Lindsay Kaspick, Regional Marketing Manager of Koch Fertilizer Canada ULC, was appointed Chair of FC's Board of Directors, succeeding Sarah Fedrochuk, VP of Government and Public Affairs of The Mosaic Company in North America, who remained a member of the Board along with Greg Kennette (CF Industries), Duncan Pottinger (Nutrien), and Manda Huska (Yara North America). In 2025, Stephen Jonkhans replaced his CF Industries colleague Greg Kennette on the FC Board.

262. The Sulfur Institute ("TSI"). Nutrien Ltd., Mosaic, and Koch Sulfur Products Company L.L.C. are all members and Board members of TSI, a global association for sulfur and sulfuric acid professionals based in Washington, D.C. TSI sponsors several in-person trade events each year, including the Sulphur World Symposium and its annual Executive Committee Meeting. Sulfur is used to process phosphate rock into phosphate fertilizers.

263. Agricultural Retailers Association ("ARA"). Koch Agronomic Services, LLC, and The Mosaic Company are both members of the ARA, an industry trade group based in Arlington, Virginia. Nathan Packer (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company) sit on the ARA Board. The ARA hosts recurring in-person events, including the Annual ARA Conference and Expo and semi-annual in-person meetings of ARA committees.

264. Taken together, TFI, IFA, Canpotex, PLNL, Fertilizer Canada, and the shared conference circuit created a multi-layered, overlapping network of competitor interaction that spanned every level of each Defendant's organization, from CEO to commercial staff, and operated continuously throughout the Class Period, supplying the infrastructure through which a common understanding could be reached, communicated, and maintained across five years and five companies.

**4. High Barriers to Entry**

265. High barriers to entry make a market susceptible to collusion. A collusive arrangement that raised prices above competitive levels would ordinarily attract new entrants seeking to share in the supracompetitive pricing, so significant barriers to entry facilitate both the formation and the maintenance of a cartel.

266. The fertilizer industry is characterized by exceptionally high barriers to entry that shield Defendants' coordinated pricing scheme from competitive erosion. High barriers are a recognized structural plus factor because they indicate that supracompetitive prices can be maintained for extended periods without triggering the entry that would restore competitive prices. *See* Areeda & Hovenkamp, *Antitrust Law* ¶1434 (2023). The barriers in this industry are among the most restrictive in the U.S. economy.

267. Capital requirements. A new grassroots nitrogen fertilizer plant in the United States requires capital investment of approximately $1.5 billion to $3 billion or more, depending on capacity, and a new phosphate rock mine and processing facility requires comparable investment. A new potash mine, which requires sinking mine shafts hundreds of meters into the earth, constructing underground infrastructure, and building surface processing facilities, requires capital investment of $4 billion to $10 billion or more, with development timelines of 10 to 15 years from project inception to first production. BHP Billiton's Jansen potash project in Saskatchewan, announced in 2013, has required more than $5 billion in capital and is not expected to reach commercial production until 2026 or later. Investment of that magnitude places new entry beyond the realistic capacity of any firm not already operating in the industry at scale.

268. Natural resource constraints. Phosphate and potash fertilizers can be produced only where geological deposits of the relevant minerals exist. United States phosphate rock deposits are concentrated in Florida and North Carolina, where Mosaic already controls the dominant

mining operations, and North American potash deposits lie overwhelmingly in Saskatchewan, Canada, where Nutrien controls the dominant mine network. No significant untapped phosphate or potash deposits in the continental United States are accessible to new entrants at competitive cost. A new entrant seeking to compete with Mosaic in phosphate or Nutrien in potash would have to develop low-grade domestic deposits at uncompetitive cost or rely on foreign supply, which Defendants have actively worked to exclude through tariff petitions.

269. Regulatory and permitting barriers. New mine development requires environmental impact assessments, mine permits, water rights, zoning approvals, and other regulatory authorizations that can take years to obtain and are subject to challenge and delay. Nutrien's Geismar clean ammonia project, announced years ago by a company with existing operational infrastructure, established supplier and customer relationships, and access to capital, remained "on indefinite pause" as of 2024. If the dominant incumbent producer cannot efficiently permit and construct new capacity, the barriers facing a new competitor are vastly higher.

270. Distribution infrastructure. Fertilizer distribution requires access to specialized terminal infrastructure, barge networks, rail loading facilities, and deep-water port capacity. Nutrien's ownership of the largest agricultural retail network in North America, with more than 1,900 locations, gives it a distribution advantage that a new entrant could not replicate without decades of investment. The combination of production, resource, regulatory, and distribution barriers makes the prospect that new entry will constrain Defendants' pricing power within any realistic time horizon essentially nil.

271. At the same May 12, 2026 Senate Agriculture Committee hearing, Trent Kubik testified that the fertilizer market is not only highly concentrated but also vertically integrated. He testified that CF Industries controls 42% of ammonia production and that Nutrien and Mosaic

produce 85% of U.S. phosphate rock. He also noted that Nutrien operates the largest direct-to-grower distribution network, with distribution points and retail locations.

272. The USDA found that just three companies control 90% of Midwest fertilizer storage and distribution. CF Industries distributes fertilizer through a system of terminals, warehouses, and associated transportation equipment located primarily in the Midwest. Nutrien operates approximately 440 wholesale fertilizer distribution points, including 21 terminals. These companies control warehouses for fertilizer storage through long-term leases, which they have used to block new entrants.

273. In comments submitted to the USDA, farmers described how incumbents made entry impossible, particularly for competitors with new technologies. One commenter described how fertilizer manufacturers may exercise market power to "set prices below production costs in order to drive out the new competition [green ammonia competitor]." Another suggested that fertilizer companies with market power may also stifle research into new technology.

274. The story of K+S AG ("K+S"), a German fertilizer company, illustrates the stranglehold the largest fertilizer companies hold over manufacturing and distribution. In 2017, K+S attempted to enter the U.S. fertilizer market by opening a new potash mine in western Canada. Despite being the fifth largest global potash seller, K+S could not secure a distribution and storage facility for potash fertilizer in the United States, and it tried and failed to work with Koch Industries to secure a warehouse network. PotashCorp and Agrium, which later combined to form Nutrien, instead used their own warehouses and long-term leases to keep their potash fertilizer infrastructure exclusive.

275. K+S never gained footing in the market despite its partnership with Koch. As one executive explained, "That is a very key piece of supply chain, . . . For any manufacturer of dry fertilizer, they really need to put their back into having tonnes close enough to end users."

**5. Inelastic Demand**

276. Fertilizer demand is highly price-inelastic: farmers cannot meaningfully reduce their fertilizer purchases in response to price increases without suffering severe yield losses and economic harm. Inelastic demand is a recognized plus factor because it is one of the key conditions that enables and sustains a price-fixing conspiracy, ensuring that supracompetitive prices do not trigger the demand destruction that would undermine the conspiracy's profitability.

277. Nitrogen, phosphorus, and potassium are essential, irreplaceable nutrients that crops require for growth, and no commercially viable substitute exists for commercial farming operations. Organic alternatives such as manure, compost, and cover crops can supplement but cannot replace synthetic fertilizers on the majority of U.S. commercial crop acres, particularly in corn production, which requires 140 pounds to 160 pounds of nitrogen per acre applied seasonally. Farmers who do not apply adequate fertilizer face yield reductions of 20% to 40%, which at any realistic crop price exceed the cost of fertilizer even at supracompetitive prices. Farmers will therefore pay nearly any price for fertilizer before reducing crop production, a direct manifestation of inelastic demand.

278. As described above in Section IV.A.4, farmers must purchase nitrogen, phosphorus, and potassium every growing season and cannot forgo any one of those nutrients in response to a significant, non-transitory price increase. Farmers must buy each nutrient every season to maximize their yields.

279. Substantial evidence confirms the inelastic character of fertilizer demand. A USDA survey of more than 1,600 farmers found that 72% expressed concerns about fertilizer producer

market power and 62% described unfair price-setting practices, confirming that farmers perceived themselves as captive buyers with no realistic alternative. Economists at the University of Illinois projected that the 2021 and 2022 fertilizer cost increases would reduce net farm income in Illinois alone by 34%, confirming that farmers absorbed the cost increase rather than reducing their fertilizer purchases.

### 6. High Degree of Product Interchangeability

280. When products are fungible or closely substitutable, a price increase by one producer drives buyers to competitors, the mechanism that ordinarily disciplines pricing in competitive markets. When products are standardized and interchangeable across all major producers, a price increase by a coordinating group of producers succeeds, because buyers have no competitive alternative.

281. Fertilizer products are highly standardized commodities. Urea is urea: whether produced by CF Industries, Nutrien, or Koch, it is chemically identical. Muriate of potash (MOP) is standardized by nutrient grade and is fungible whether produced at Nutrien's Allan mine or Mosaic's Esterhazy mine. DAP and MAP are standardized phosphate fertilizers that follow strict industry standards and are interchangeable regardless of producer, and NPK blends with the same ratio, such as 20-20-10, substitute for one another no matter who produced the underlying nutrients. Because meaningful product differentiation is absent, farmers choose among producers on price and availability rather than on product quality or brand, and in a competitive market that fungibility would ensure robust price competition as buyers switched to the lowest-cost producer.

282. The fungibility of fertilizer products also lets Defendants observe and verify each other's pricing through published commodity price indices, a transparent verification mechanism for any coordinated pricing scheme. Green Markets, DTN/Progressive Farmer, and the USDA's Agricultural Prices report publish weekly or monthly fertilizer price data for all major products

and regions, so any Defendant that deviated from coordinated pricing by offering discounts would appear in those indices within weeks. The combination of product fungibility and transparent price discovery makes coordination both easy to implement and easy to monitor, conditions that antitrust economists identify as highly conducive to tacit collusion.

**7. Defendants' Prior Antitrust Violations and History of Cartel Conduct**

283. The fertilizer industry has a well-documented history of antitrust violations and cartel behavior, including by at least two Defendants and their corporate predecessors. That history reflects an entrenched culture of anticompetitive conduct and demonstrates that the conspiracy alleged here is not an anomaly but a continuation of a long-standing pattern.

284. In 2008, the last time global potash prices spiked to their highest recorded levels, potash buyers filed multiple class action antitrust complaints in the United States alleging that a global cartel of potash producers, including PotashCorp (Nutrien's predecessor), Mosaic, and Agrium (also a Nutrien predecessor), conspired to fix potash prices and restrict supply in violation of Section 1 of the Sherman Antitrust Act.

285. In that case, plaintiffs alleged that Canpotex provided Mosaic, Agrium, and PotashCorp with "access to one another's sensitive production and pricing information." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 850 (7th Cir. 2012) (*en banc*), *cert. dismissed*, 570 U.S. 935 (2013).

286. The district court found that the plaintiffs had sufficiently "allege[d] parallel production cuts which at least for some Defendants represented a 'radical change' in behavior; overlapping business ventures; specific meetings attended by Defendants which precipitated production cuts and price increases; and a 'joint sales suspension' that was contrary to Defendants' economic interests." *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 937 (N.D. Ill. 2009). The Seventh Circuit affirmed.

287. In 2013, Mosaic, PotashCorp, and Agrium agreed to pay a combined $97 million to the direct-purchaser plaintiffs to resolve that litigation. Those settlements, entered into by the direct corporate predecessors of Nutrien and by the same Mosaic entity named as a Defendant here, establish a concrete prior episode in which these very companies coordinated anticompetitively the last time prices reached comparable heights.

## V. ANTITRUST INJURY AND STANDING

288. Defendants' anticompetitive conduct had the following effects, among others:

289. Price competition has been restrained or eliminated with respect to Fertilizer Products;

290. Fertilizer Product prices have been fixed, raised, stabilized, or maintained at artificially inflated levels;

291. Plaintiffs and the proposed Classes have been deprived of free and open competition; and

292. Plaintiffs and the proposed Classes paid artificially inflated Fertilizer Product prices.

293. Plaintiffs and the proposed Classes have standing under the antitrust laws pleaded below as purchasers of Defendants' products. The harm Plaintiffs and the proposed Classes suffered is directly traceable to Defendants' unlawful conduct.

294. The overcharges Plaintiffs and the proposed Classes paid are paradigmatic antitrust injury, that is, injury of the type the federal antitrust laws were enacted to redress.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

295. Plaintiffs' claims are timely. To the extent any claim might otherwise be subject to a statute of limitations defense, Defendants' fraudulent concealment of their conspiracy tolled the running of any applicable limitations period.

296. The conspiracy alleged herein is, by its nature, self-concealing. It consisted of coordinated pricing and supply restriction decisions made privately among Defendants' senior executives, the details of which were never disclosed to Plaintiffs or the public.

297. Beyond the inherently self-concealing nature of the conspiracy, Defendants took affirmative steps to disguise their coordinated pricing and supply restriction as the product of legitimate market forces. Throughout the Class Period, Defendants publicly and repeatedly attributed their supracompetitive pricing to exogenous events and cost pressures, including pandemic-related disruptions, extreme weather events, geopolitical sanctions, foreign export restrictions, and the conflict in Ukraine. By offering these pretextual explanations in earnings calls, investor presentations, press releases, and public statements, Defendants constructed a facially legitimate but materially incomplete and misleading narrative that concealed the true cause of the price increases: their coordinated agreement to fix prices and restrict supply.

298. That fertilizer prices rose sharply during the Class Period was visible to any market participant. That Defendants offered consistent, facially plausible explanations for those increases, blaming natural gas prices, pandemic-related logistics disruptions, extreme weather events, Chinese export restrictions, and ultimately the Russian invasion of Ukraine, was equally visible. What was not visible, and what Plaintiffs had no means to determine from public information alone, was that those explanations were pretextual and that the increases reflected a coordinated agreement rather than independent competitive responses to shared market conditions. Parallel pricing in a concentrated commodity market is, standing alone, consistent with lawful oligopolistic behavior; it does not reveal an unlawful agreement on its face. Only the disclosure of the government investigations, including the DOJ's formal investigation announced in March 2026, the FTC's investigation announced in May 2026, and senior USDA officials' public statements

characterizing Defendants' conduct as collusion, gave Plaintiffs a basis to understand that the coordination behind the prices was unlawful rather than merely structural.

299. Plaintiffs exercised reasonable diligence but could not have discovered Defendants' conspiracy before the public disclosure of the government investigations and official statements beginning in late 2025. Plaintiffs are farmers and agricultural purchasers, not market analysts or antitrust investigators, and they lack the financial expertise required to detect Defendants' conspiracy from publicly available data alone. Before the disclosure of the government investigations, Plaintiffs had no basis to distinguish Defendants' supracompetitive pricing from the cost-driven and supply-shock explanations Defendants had publicly and repeatedly offered.

300. The conspiracy alleged herein also constitutes a continuing violation of Section 1 of the Sherman Antitrust Act. Each sale of Fertilizer Products at supracompetitive prices during the Class Period was a separate overt act in furtherance of the conspiracy, and each such sale restarted any applicable limitations period. The conspiracy was ongoing as of the date this Complaint was filed, as Defendants' continued supracompetitive pricing demonstrates. Plaintiffs' claims are therefore timely under both the fraudulent concealment doctrine and the continuing violation doctrine.

## VII. CLASS ACTION ALLEGATIONS

301. Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of all other persons and entities similarly situated (the "Direct Purchaser Class"), defined as:

> All persons and entities in the United States and its territories who purchased a Fertilizer Product[13] directly from one or more of the Defendants at any time during the period from January 1, 2021, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

---

13 As defined in *supra* n. 2.

302. Plaintiffs also bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as representatives of all other persons and entities similarly situated (the "Indirect Purchaser Class"), defined as:

> All persons and entities in the United States and its territories who purchased a Fertilizer Product[14] from any non-defendant entity or person at any time during the period from January 1, 2021, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

303. Excluded from the Classes are: (1) the Court, including its staff, presiding over this action and any members of their immediate families; (2) all jurors assigned to this case; (3) Defendants, Defendants' subsidiaries, affiliates, parents, successors, and predecessors, any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; (4) Plaintiffs' counsel and Defendants' counsel; and (5) state and federal government entities.

304. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

305. **Numerosity:** Both Classes are so numerous that joinder is impracticable. Plaintiffs do not know the exact number of Class members but believe, given the nature of the Fertilizer Product industry, that the Classes include at least hundreds of thousands of individuals and entities in the United States.

306. **Commonality and Predominance:** Common questions of law and fact exist as to all members of both Classes and predominate over questions affecting only individual Class members. The same unlawful price-fixing conspiracy injured Plaintiffs and the members of both

---

14 As defined in *supra* n. 2.

Classes, and Defendants' anticompetitive conduct applied generally to all Class members. Common questions of fact and law include, but are not limited to:

a. whether Defendants combined and/or conspired to fix, raise, maintain, and/or stabilize prices of Fertilizer Products at any time during the Class Period;

b. whether Defendants fixed, raised, maintained, and/or stabilized prices of Fertilizer Products sold to purchasers in the United States at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

c. whether Defendants engaged in conduct that violated Sections 1 and 3 of the Sherman Act;

d. whether Defendants fraudulently concealed their conduct from purchasers of Fertilizer Products in the United States;

e. whether Defendants' conduct caused the prices of Fertilizer Products sold to Plaintiffs and members of the Classes to be higher than the prices that would have prevailed in a competitive market as a result of their restraint of trade;

f. whether Plaintiffs and members of the Classes were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages; and

g. whether Plaintiffs and members of the Classes are entitled to, among other things, injunctive relief and, if so, the nature and extent of such relief.

307. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Classes, because Plaintiffs and all members of both Classes were injured by the same misconduct, Defendants' contracting, combining, or conspiring to fix, maintain, or raise the prices of Fertilizer Products, and each paid artificially inflated prices for Fertilizer Products.

308. **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience prosecuting complex litigation and class actions, including antitrust class actions. Plaintiffs have no interests antagonistic to those of the Classes.

309. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with federal and state law. Because each individual Class member's claim is small relative to the complexity of the litigation, and because of Defendants' financial resources, Class members are unlikely to pursue redress individually for the violations detailed in this Complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of individual lawsuits, and it provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

310. **Injunctive Relief:** Defendants have acted or refused to act on grounds generally applicable to the Classes, which makes final injunctive relief and corresponding declaratory relief appropriate with respect to each Class as a whole.

## CLAIMS FOR RELIEF

## I. VIOLATION OF THE SHERMAN ACT

### COUNT 1
### Violation of the Sherman Act, 15 U.S.C. §§1, 3

311. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding paragraphs as if fully set forth herein.

312. During the Class Period, Defendants entered into, continued, and gave effect to a combination and conspiracy in unreasonable restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3.

313. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to: (a) fix, raise, stabilize, and maintain the prices of Fertilizer Products sold in the United States at supracompetitive levels; and (b) restrict, limit, and suppress the supply of Fertilizer Products available to U.S. purchasers.

314. Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses and property paying more for Fertilizer Products purchased from Defendants and their co-conspirators than they would have paid (and will continue to pay) in the absence of the combination and conspiracy.

315. Defendants' conduct constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act. It is also unlawful under a rule of reason analysis.

316. Plaintiffs and the members of the Direct Purchaser Class are entitled to treble damages, under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26.

317. Plaintiffs and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## II. VIOLATIONS OF STATE ANTITRUST LAWS

318. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding paragraphs as if fully set forth herein.

319. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize the price of Fertilizer Products in various states. The result of this caused an unreasonable restraint of trade and commerce and harmed consumers in violation of the various state antitrust and consumer protection laws set forth below.

320. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the conspiracy, including agreeing to fix, raise,

maintain, or stabilize the price of all Fertilizer Products sold in the United States, exchanging competitively sensitive information between and among Defendants; and participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

321. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize the price of Fertilizer Products at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more to purchase Fertilizer Products than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

322. In addition, Defendants have profited significantly from the alleged conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

323. Accordingly, Plaintiffs that purchased Fertilizer Products from non-defendant retailers ("Indirect Purchaser Plaintiffs") and members of the Indirect Purchaser Class (together "Indirect Purchaser Plaintiffs and Class Members") in each of the following jurisdictions seek damages (including statutory damagers where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

324. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust statutes.

325. The state law counts that follow are brought on behalf of Indirect Purchaser Plaintiffs and Class Members and any reference to the "Class" is a reference to the Indirect Purchaser Class unless otherwise specified.

**COUNT 2: ALABAMA**

326. Defendants have entered into unlawful agreements in restraint of trade in violation of Ala. Code §6-5-60, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Alabama; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ala. Code §6-5-60, *et seq*.

**COUNT 3: ARIZONA**

327. Defendants have entered into unlawful agreements in restraint of trade in violation of Ariz. Rev. Stat. §44-1401, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Arizona; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §44-140, *et seq.*

## COUNT 4: CALIFORNIA

328. Defendants have entered into unlawful agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §16700, *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720. Each Defendant has acted in violation of Cal. Bus & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of Fertilizer Products at supracompetitive levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among each Defendant and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Fertilizer products. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and fixing, raising, and stabilizing the price of Fertilizer Products. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout California; (2) prices for Fertilizer Products provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the state of California and throughout the United States; and (3) those who purchased Fertilizer Products indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a result of Defendants' violation of Cal. Bus. & Prof. Code §16720, Plaintiffs and members of the Class seek treble damages and their costs of suit, including reasonable attorneys' fees, pursuant to Cal. Bus. & Prof. Code §16750(a).

**COUNT 5: COLORADO**

329. Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. §6-4-104, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Colorado; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Colo. Rev. Stat. §6-4- 104, *et seq.*

**COUNT 6: CONNECTICUT**

330. Defendants have entered into unlawful agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. §35-26, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Connecticut; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Conn. Gen. Stat. Ann. §35-26, *et seq.*

**COUNT 7: DISTRICT OF COLOMBIA**

331. Defendants have entered into unlawful agreements in restraint of trade in violation of D.C. Code §28-4501, *et seq.* Defendants' conspiracies had the following effects: (1) price

competition for Fertilizer Products was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. Code §28-4501, *et seq*.

**COUNT 8: HAWAII**

332. Defendants have entered into unlawful agreements in restraint of trade in violation of Haw. Rev. Stat. Ann. §480-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Hawaii; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Haw. Rev. Stat. Ann. §480-1, *et seq*.

**COUNT 9: ILLINOIS**

333. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the

Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1, *et seq.* Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under 740 Ill. Comp. Stat. 10/1, *et seq.*

**COUNT 10: IOWA**

334. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1, *et seq.*

**COUNT 11: KANSAS**

335. Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. §50-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas. Defendants' conduct constitutes a per se violation and, in the alternative, is unlawful under a quick-look or rule-of-reason analysis. Members of the Class purchased Fertilizer Products within the State of Kansas during the Class Period. But for Defendants' conduct set forth, the price of Fertilizer Products would have been

lower, in an amount to be determined at trial. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. K.S.A. 50-161(b). Members of the Class were injured with respect to purchases of Fertilizer Products in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Kan. Stat. Ann. §50-101, *et seq.*

**COUNT 12: MAINE**

336. Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Maine; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, §1104.

**COUNT 13: MARYLAND**

337. Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law§11-204. Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maryland; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct

substantially affected Maryland commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Md. Code Ann., Com. Law§11-202, *et seq*.

**COUNT 14: MICHIGAN**

338. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Mich. Comp. Laws §445.771, *et seq*.

**COUNT 15: MINNESOTA**

339. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Minn. Stat. §325D.49, *et seq.*

**COUNT 16: MISSISSIPPI**

340. Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann. §75-21-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Fertilizer Products prices were raised, fixed, maintained,

and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Miss. Code Ann. §75-21-1, *et seq.*

**COUNT 17: NEBRASKA**

341. Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Neb. Rev. Stat. §59-801, *et seq.*

**COUNT 18: NEVADA**

342. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010, *et seq*.

**COUNT 19: NEW HAMPSHIRE**

343. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and

eliminated throughout New Hampshire; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. Rev. Stat. §356:1, *et seq.*

**COUNT 20: NEW MEXICO**

344. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. §57-1-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.M. Stat. Ann. §57-1-1, *et seq.*

**COUNT 21: NEW JERSEY**

345. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Jersey Antitrust Act, N.J.S.A. §56:9-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Product price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) Fertilizer Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under the New Jersey Antitrust Act, N.J.S.A. §56:9-1, *et seq*.

**COUNT 22: NEW YORK**

346. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law §340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout New York; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, §340, *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. Gen. Bus. Law §340, *et seq.*

**COUNT 23: NORTH CAROLINA**

347. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. §75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. Gen. Stat. §75-16, *et seq.*

**COUNT 24: NORTH DAKOTA**

348. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period,

Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.D. Cent. Code §51-08.1-01, *et seq.*

**COUNT 25: OREGON**

349. Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §646.725, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Or. Rev. Stat. §646.780, *et seq.*

**COUNT 26: RHODE ISLAND**

350. Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-4, *et seq.* The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under R.I. Gen. Laws §6-36-11, *et seq.*

**COUNT 27: SOUTH DAKOTA**

351. Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws §37-1-3.1, *et seq.* Defendants' combinations or conspiracies had

the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under S.D. Codified Laws §37-1-3.1, *et seq.*

**COUNT 28: TENNESSEE**

352. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Tenn. Code Ann. §47-25-101, *et seq.*

**COUNT 29: UTAH**

353. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. §76-16-501, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Utah; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Utah Code Ann. §76-16-501, *et seq.*

**COUNT 30: VERMONT**

354. Defendants have entered into an unlawful agreement in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §2453, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Vt. Stat. Ann. tit. 9 §2465, *et seq.*

**COUNT 31: WEST VIRGINIA**

355. Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code §47-18-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under W. Va. Code §§47-18-9, *et seq.*, and 142-9-2.

**COUNT 32: WISCONSIN**

356. Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal

conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Wis. Stat. §133.01, *et seq.*

## III. VIOLATION OF STATE CONSUMER PROTECTION STATUTES

357. Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

358. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

359. Accordingly, Plaintiffs that purchased Fertilizer Products from non-defendant retailers (previously defined as the "Indirect Purchaser Plaintiffs") and members of the Indirect Purchaser Class (previously defined together as the "Indirect Purchaser Plaintiffs and Class Members") in each of the following jurisdictions seek damages (including statutory damagers where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

360. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state consumer protection statutes.

361. The state law counts that follow are brought on behalf of Indirect Purchaser Plaintiffs and Class members and any reference to the "Class" is a reference to the Indirect Purchaser Class unless otherwise specified.

### COUNT 33: ARKANSAS

362. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101, *et seq.* Defendants knowingly agreed to, and did in

fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Fertilizer Products were sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiffs and members of the Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; and (3) individuals have been deprived of open competition. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

**COUNT 34: CALIFORNIA**

363. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or distributed Fertilizer Products in California, and committed, and continue to commit, acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200, *et seq.*, by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200. The acts, omissions, misrepresentations, practices, and

nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720, *et seq.*, set forth above; Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720, *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Fertilizer Products in the state of California within the meaning of Cal. Bus. & Prof. Code §17200, *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200, *et seq.* Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supracompetitive and artificially inflated prices for Fertilizer Products. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200, *et seq.* As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits,

compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

**COUNT 35: DISTRICT OF COLUMBIA**

364. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of D.C. Code §28-3091, *et seq*. Members of the Indirect Purchaser Class purchased Fertilizer Products within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of Fertilizer Products would have been lower, in an amount to be determined at trial. Defendants are "merchants" within the meaning of D.C. Code §28-3901(a)(3). Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Fertilizer Products market, a substantial part of which occurred within the District of Columbia. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Fertilizer Products market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Fertilizer Products Market. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce. As a direct and proximate cause of Defendants' unlawful conduct, members of the Indirect Purchaser Class have been injured in their business or property and are threatened with further injury. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code §28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Indirect Purchaser Class seek all relief available under that statute

**COUNT 36: FLORIDA**

365. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Florida; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; and (3) individuals have been deprived of open competition. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Fla. Stat. §501.201, *et seq.*

**COUNT 37: ILLINOIS**

366. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.* By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.* Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Fertilizer Products markets, a substantial part of which occurred within Illinois. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Fertilizer Products, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Fertilizer Products markets. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the state of Illinois. Defendants' conduct misled consumers, withheld material facts, and resulted in material

misrepresentations to Plaintiffs and members of the Class. Defendants' unlawful conduct substantially affected Illinois' trade and commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**COUNT 38: MASSACHUSETTS**

367. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A §1, *et seq*. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Massachusetts. But for Defendants' conduct set forth herein, the price of Fertilizer Products would have been lower, in an amount to be determined at trial. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Fertilizer Products, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Fertilizer Products market. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Indirect Purchaser Class have been injured in their business or property and are threatened with further injury. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A §1, *et seq*. Defendants' conspiracies had the following effects in Massachusetts: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised,

fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Indirect Purchaser Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect Purchaser Class were injured in their business or property in Massachusetts by paying supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce. Defendants' violations of Massachusetts law were flagrant and willful. Accordingly, Plaintiffs and members of the Indirect Purchaser Class seek all forms of relief available under Mass. Gen. Laws Ch. 93A §1, *et seq*.

**COUNT 39: MISSOURI**

368. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Chapter 407 of the Missouri Merchandising Practices Act, Mo. Ann. Stat. §407.010, *et seq*. Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization. Mo. Rev. Stat. §407.020 prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. §407.025, which provides for the relief sought in this count. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Indirect Purchaser Class concerning their unlawful activities and artificially inflated prices for Fertilizer Products. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the Indirect Purchaser Class as they

related to the cost of Fertilizer Products they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Fertilizer Products by making public statements that were not in accord with the facts. Defendants' statements and conduct related to the price of Fertilizer Products were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Indirect Purchaser Class to believe that they were purchasing Fertilizer Products at prices established by a free and fair market. Plaintiffs and Class Members purchased Fertilizer Products for end use within the State of Missouri during the Class Period. Plaintiffs and Class Members' purchases were made for personal, household, or family use and not for resale. But for Defendants' conduct set forth, the price of Fertilizer Products would have been lower, in an amount to be determined at trial. Plaintiffs and Class Members were injured with respect to purchases of Fertilizer Products in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 40: MONTANA**

369. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §30-14-103, *et seq*., and 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) the demand for Fertilizer Products was artificially increased throughout Montana; (2) Plaintiffs and Class Members were deprived of free and open competition; and (3) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for Fertilizer Products. Plaintiffs and Class Members purchased Fertilizer Products, primarily for personal, family, or household purposes. Such purchases were made for end use and

not for resale, and qualify as consumer purchases. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §30-14-103, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and Class Members seek all relief available under that statute.

**COUNT 41: MINNESOTA**

370. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.43, *et seq.* Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as purchasers of the Defendants' goods, and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs and the members of the Class. Defendants' unlawful conduct had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; and (3) individuals have been deprived of open competition. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and Fertilizer Products purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**COUNT 42: NEBRASKA**

371. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. §59-1601, *et seq.* Defendants' conduct has had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Nebraska; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Nebraska. Accordingly, Plaintiffs and members of the Damages Class seek all forms of available relief under Neb. Rev. Stat. §59-1601, *et seq*.

**COUNT 43: NEVADA**

372. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §598.0903, *et seq.* Defendants' conduct has had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Nevada; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Nevada. Accordingly, Plaintiffs and members of the Damages Class seek all forms of available relief under Nev. Rev. Stat. §598.0903, *et seq*.

**COUNT 44: NEW MEXICO**

373. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. Ann. §57-12-2(E) because it "takes advantage of the lack of knowledge . . . of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing Fertilizer Products because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of Fertilizer Products, including their illegal conspiracy to secretly fix the price of Fertilizer Products at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. Defendants' unlawful conduct had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for Fertilizer Products. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged

in unfair competition, or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 45: NORTH CAROLINA**

374. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fertilizer Products were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to end user indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for

Fertilizer Products. During the Class Period, Defendants marketed, sold, or distributed Fertilizer Products in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Fertilizer Products in North Carolina. Plaintiffs and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**COUNT 46: SOUTH CAROLINA**

375. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10, *et seq.*, and 39-5-140, and, accordingly, Plaintiff and the members of the Class seek all relief available under those statutes.

**COUNT 47: VERMONT**

376. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fertilizer Products were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for Fertilizer Products. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fertilizer Products prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fertilizer Products, likely misled all end user indirect purchasers acting reasonably under the circumstances to believe that they were purchasing Fertilizer Products at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute unfair competition, or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §2451, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 48: WISCONSIN**

377. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wis. Stat. §100.18, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fertilizer Products were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' Fertilizer Products prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Wisconsin; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of Fertilizer Products. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of the Fertilizer Products at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fertilizer Products at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of the Fertilizer Products they purchased. Defendants have engaged in unfair competition, or unfair or deceptive acts or practices in violation of Wis. Stat.

§100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, respectfully request that this Court:

(a) Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

(b) Find and adjudge that Defendants' conduct violated Sections 1 and 3 of the Sherman Antitrust Act;

(c) Award all damages to which Plaintiffs and Class members are entitled, including treble damages under the Clayton Antitrust Act;

(d) Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the legal rate;

(e) Enter injunctive relief, declaratory relief, or both, as is necessary to protect the interests of Plaintiffs and Class members, including enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from continuing, maintaining, or renewing in any manner the conduct, contract, conspiracy, or combination alleged herein, from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(f) Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

(g) Award such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury on all issues so triable.

**DESIGNATION OF PLACE OF TRIAL**

Pursuant to D. Kan. L.R. 40.2, Plaintiffs request Kansas City, Kansas, as the place of trial.

Dated: August 26, 2026 Respectfully Submitted,


| | |
|---|---|
| | /s/ David Rebein<br>David Rebein, KS #10476<br>Pablo H. Mose, KS #27532<br>**REBEIN BROTHERS, PA**<br>1715 Central Ave.<br>Dodge City, KS 67801<br>Tel: (620) 227-8126<br>dave@rbr3.com<br>pablo@rbr3.com<br><br>*Counsel for Plaintiffs* |
| /s/ Patrick McGahan<br>Patrick McGahan (NY #577027)*<br>**SCOTT+SCOTT ATTORNEYS AT LAW LLP**<br>156 S Main Street<br>P.O. Box 192<br>Colchester, CT 06415<br>Tel: (860) 537-5537<br>Fax: (860) 537-4432<br>pmcgahan@scott-scott.com<br><br>Patrick Coughlin (CA #111070)*<br>Carmen Medici (CA #248417)*<br>Daniel J. Brockwell (CA #335983)*<br>Bridget F. Gramme (CA #231953)*<br>Heidi B. Weaver (CA #204895)* | /s/ Patrick J. Stueve<br>Patrick J. Stueve, KS #13847<br>Steve N. Six, KS #16151<br>Bradley T. Wilders, D. Kan #78301<br>Caleb Wagner, D. Kan. #78945<br>Benjamin J. Stueve, KS #28515<br>**STUEVE SIEGEL HANSON LLP**<br>460 Nichols Road, Suite 200<br>Kansas City, Missouri 64112<br>Telephone: (816) 714-7100<br>Facsimile: (816) 714-7101<br>stueve@stuevesiegel.com<br>six@stuevesiegel.com<br>wilders@stuevesiegel.com<br>wagner@stuevesiegel.com |

| | |
|---|---|
| **SCOTT+SCOTT ATTORNEYS AT LAW LLP**<br>600 W. Broadway, Suite 3300<br>San Diego, CA 92101<br>Tel: (619) 233-4565<br>Fax: (619) 233-0508<br>pcoughlin@scott-scott.com<br>cmedici@scott-scott.com<br>dbrockwell@scott-scott.com<br>bgramme@scott-scott.com<br>hweaver@scott-scott.com<br><br>Karin Garvey (NY #2997831)*<br>Robin A. van der Meulen (NY #4760567)*<br><br>Brian M. Hogan (IL #6286419)*<br>**SCOTT+SCOTT ATTORNEYS AT LAW LLP**<br>230 Park Ave., 24th Floor<br>New York, NY 10169<br>Tel: (212) 223-6444<br>Fax : (212) 223-6334<br>kgarvey@scott-scott.com<br>rvandermeulen@scott-scott.com<br>brian.hogan@scott-scott.com<br><br>/s/ Stuart A. Davidson<br>Stuart A. Davidson (FL #84824)*<br>Mark J. Dearman (FL #982407)*<br>Anny Marie Martin (FL #1000491)*<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>225 NE Mizner Boulevard, Suite 720<br>Boca Raton, FL 33432<br>Telephone: (561) 750-3000<br>Facsimile: (561) 750-3364<br>sdavidson@rgrdlaw.com<br>mdearman@rgrdlaw.com<br>amartin@rgrdlaw.com<br><br>Alexandra S. Bernay (CA #211068)*<br>Arthur L. Shingler III (CA #181719)*<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423<br>xanb@rgrdlaw.com<br>ashingler@rgrdlaw.com<br><br>/s/ Michelle J. Looby<br>Daniel C. Hedlund (MN Bar No. 258337)*<br>Michelle J. Looby (MN Bar No. 0388166)*<br>Anthony J. Stauber (MN Bar No. 0401093)* | ben.stueve@stuevesiegel.com<br><br>/s/ Rex A. Sharp<br>Rex A. Sharp, KS #12350<br>Hammons P. Hepner, KS #29138<br>Isaac L. Diel, KS #14376<br>**SHARP LAW, LLP**<br>4820 W. 75th Street<br>Prairie Village, KS 66208<br>(913) 901-0505<br>(913) 261-7564 Fax<br>rsharp@midwest-law.com<br>hhepner@midwest-law.com<br>idiel@midwest-law.com<br><br>/s/ Don M. Downing<br>Don M. Downing, MO #30405*<br>Gretchen Garrison, MO #33963*<br>Jack A. Downing, MO #70034*<br>Daniel R. Ritter. MO #69298*<br>**GRAY RITTER GRAHAM**<br>701 Market Street, Suite 800<br>St. Louis, MO 63101<br>Telephone: (314) 241-5620<br>Facsimile: (314) 241-4140<br>ddowning@grgpc.com<br>ggarrison@grgpc.com<br>jdowning@grgpc.com<br>dritter@grgpc.com<br><br>/s/ Evelyn Y. Riley<br>Evelyn Y. Riley (D.C. # 1616531)*<br>**CUNEO GILBERT FLANNERY & LADUCA, LLP**<br>2445 M Street NW, Suite 740<br>Washington, D.C. 20037<br>Tel: (202) 789-3960<br>Fax: (202) 789-1813<br>evelyn@cuneolaw.com<br><br>/s/ Amanda M. Williams<br>Amanda M. Williams (MN #341691)*<br>Casey D. Marshall (MN #395512)*<br>**BASSFORD REMELE**<br>***A Professional Association***<br>100 South 5th Street, Suite 1500<br>Minneapolis, MN 55402-1254<br>Telephone: (612) 333-3000<br>Facsimile: (612) 333-8829<br>awilliams@bassford.com<br>cmarshall@bassford.com |

**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
tstauber@gustafsongluek.com

/s/ Melissa L. Yeates
Melissa L. Yeates (PA202183)*
Joseph H. Meltzer (PA80136)*
Terence S. Ziegler (PA310318)*
Jordan E. Jacobson (PA328715)*
Daniel S. Dicce (PA331965)*
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 664-7056
myeates@ktmc.com
jmeltzer@ktmc.com
tziegler@ktmc.com
jjacobson@ktmc.com
ddicce@ktmc.com

/s/ Yifan (Kate) Lv
Yifan (Kate) Lv (CA #302704)*
Christopher M. Burke (CA #214799)*
John Chisholm (WI #1023023)*
Rachel Steyer (CA #330064)*
Robin Stemen (CA #149605)*
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Phone: (619) 369-8244
klv@burke.law
cburke@burke.law
john.chisholm@burke.law
rsteyer@burke.law
rstemen@burke.law

/s/ Margaret MacLean
Margaret MacLean (NY # 4588182)*
Vincent Briganti (NY #2785376)*
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Phone: (914) 997-0500

/s/ Kaitlin Naughton
Kaitlin Naughton (IL Bar No. 6333128)*
Bryan L. Clobes (PA Bar No. 68151)*
Jennifer W. Sprengel (IL Bar No. 6204446)*
Daniel O. Herrera (IL Bar No. 6293731)*
Henry Visser Melville (IL Bar No. 6342378)*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
knaughton@caffertyclobes.com
bclobes@caffertyclobes.com
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
hmelville@caffertyclobes.com

/s/ Adam J. Zapala
Adam J. Zapala (SBN 245748)*
Elizabeth T. Castillo (SBN 280502)*
Christopher F. Jeu (SBN 247865)*
Christian S. Ruano (SBN 352012)*
Lauren Devens (SBN 364511)*
**COTCHETT, PITRE & McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

*Counsel for Plaintiffs Kisling Ag Services LLC, Michael Wood Farms, Inc., Highway 33 Farms, Inc., Zackary McMillon, Duane Hoffer, Jr., Tim Vanco, Aaron Hasser, Randy Sullins, Paul Hatley, Coldwater Planting Company, and Bally Keal Vineyards, LLC*

| | |
|---|---|
| Fax: (914) 997-0035<br>vbriganti@lowey.com<br>mmaclean@lowey.com<br><br>/s/ Jessica N. Servais<br>Jessica N. Servais (MN #0326744)*<br>Heidi M. Silton (MN #025759X)*<br>Joseph C. Bourne (MN #0389922)*<br>**LOCKRIDGE GRINDAL NAUEN PLLP**<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN 55401<br>T: (612) 339-6900<br>F: (612) 339-0981<br>jnservais@locklaw.com<br>hmsilton@locklaw.com<br>jcbourne@locklaw.com<br><br>*Counsel for Plaintiffs David Hutfilz, Justin D. Ashmore Revocable Trust, Ryan Hager Farms, LLC, Steven Lueck, Michael Schwager, Drew Flemming, Matt Bonert, Robert Harris, Edling Farms, Inc., Greg Glass, and Pipco Fruit, LLC* | |

**Pro Hac Vice Forthcoming*